## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

```
------------------------------------------------------------------- x
EMERGING INDUSTRY TECHNOLOGIES, INC., d/b/a    :
SPENCE LABS,                                    :
                                                :
                    Plaintiff,                  :
                                                :
              v.                                :
                                                :
FIDELITY NATIONAL INFORMATION SERVICES,         :    JURY TRIAL DEMANDED
INC., and WORLDPAY INC.,                        :
                                                :
                    Defendants.                 :
                                                :
                                                :
                                                :
------------------------------------------------------------------- x
```

## COMPLAINT

Plaintiff Emerging Industry Technologies, Inc. d/b/a Spence Labs ("Plaintiff" or "Spence"), by and through its undersigned attorneys, for its complaint against defendants Fidelity National Information Services, Inc. ("Fidelity National"), and its wholly owned subsidiary, Worldpay, Inc. ("Worldpay" and together with Fidelity National, "FIS" or "Defendants"), alleges with knowledge as to itself and on information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.     This dispute involves a corporate catch and kill: FIS, a billion-dollar public financial products corporation, induced Spence, a promising startup that developed revolutionary and state-of-the-art payment processing products, into believing that if it committed to FIS, FIS would partner with Spence to help it capitalize on the need for financial technology in the cannabis industry. Spence had no reason to doubt FIS's intentions, especially given that, following extensive negotiations and due diligence, FIS was proudly touting to the market that FIS "***and***

*Spence have aligned to deliver conventional payment methods to the cannabis industry* . . . [t]hrough our combined capabilities, we're offering a transparent, fully integrated suite of digital payments," and instructing Spence and its own employees, "[w]hat we *can* say" to the market is that "*Worldpay [FIS's subsidiary] and Spence are partners*." Yet, despite widespread publicity and the many months of negotiations, due diligence, and promises that preceded it, and the well-defined material terms that resulted, FIS now refuses to move forward with the parties' commercial agreement and partnership. For FIS, disregarding Spence means little to its bottom line. For Spence, which had reworked its entire business to suit the partnership, FIS's repudiation means its end. During the parties' negotiations, FIS valued Spence at a minimum of $25 million—but after being forced to terminate its employees and wind down as a result of FIS's misconduct, Spence's value is now effectively zero.

2. At bottom, this case is about holding FIS to the bargain it struck with Spence. On the promise of an exclusive and lucrative commercial deal with FIS, Spence agreed to dedicate all its resources to the partnership, overhaul its business operations, and grant FIS a majority of its preferred shares under restrictive terms, effectively putting Spence at FIS's mercy. That commercial deal was reached. Whatever FIS's motives may have been for entering into this agreement and whatever may have transpired within FIS after the deal was announced (as explained below), FIS is bound by the bargain it struck with Spence. The commercial deal is a valid enforceable agreement that FIS cannot now repudiate without consequences. Alternatively, if the commercial deal is not an enforceable agreement, as FIS has recently suggested, then Spence has been the victim of fraud based on FIS's many misrepresentations about its intention to enter into such an agreement and reassurances that a partnership existed. In either scenario, FIS has

2

destroyed Spence's business, and it should not be permitted to profit, benefit, or evade responsibility from its wrongful conduct.

3.     The parties first began negotiations in the fall of 2021 on the heels of several large state medical and recreational cannabis legalizations. At first, FIS considered fully acquiring Spence to incubate, grow, and invest tens of millions of dollars into a company and brand that would be FIS's gateway into processing payments for the cannabis industry—an otherwise untapped market for FIS. Eventually, instead of an acquisition, FIS decided to pursue a minority investment and partnership (*i.e.*, through a commercial deal) with Spence acting as an arm's length intermediary.

4.     From there, the parties started extensive negotiations and due diligence for a partnership in which Spence and FIS would develop specialized tools to help facilitate and process payments at cannabis dispensaries. Before the partnership, Spence had already built and offered certain technologies for cannabis payment processing. Through its proprietary technology and mobile payments platform, Spence facilitated compliant and transparent financial transactions between multiple parties in the completion of non-cash transactions at state-legalized cannabis dispensaries. Because Spence did not own or operate a payment network, however, its business relied on regulated financial institutions, sponsor banks, or payment processors to assist in the transfer and movement of funds. The partnership with FIS allowed Spence to use FIS's payment processing connections (*e.g.*, credit/debit card networks and sponsor banks, which FIS represented would initially be Fifth Third Bank) and gave Spence a processor with access to the credit/debit card networks. The new card processing capabilities and products—namely "Buy Now Pay Later" and "Instant Pay-with-Wallet"—that FIS and Spence partnered to develop and offer, were set to

revolutionize the way customers transacted at legalized dispensaries, which have historically been limited to cash (or illegal workarounds).

5.     As part of due diligence, Spence turned over its blueprints to the cannabis financial processing industry, in which FIS had little to no experience.  In order to lure in Spence, FIS promised a lucrative and exclusive commercial partnership agreement.  And to lock Spence into this partnership with FIS, FIS required Spence to undertake several large remediation measures that were tailored for the Spence-FIS commercial partnership.  FIS also required Spence to agree to, among other things, restrictions on its ability to conduct business with FIS competitors.  To accomplish this, FIS offered to (and did) invest $4.5 million dollars in Spence, under the pretense that the money would be used to develop and build up Spence's infrastructure to support the partnership's products.  Spence, of course, had no reason to doubt FIS.  FIS, after all, was not a private equity firm and generally only invested in, and required business remediations from, companies with which it partnered on a commercial level.  As Spence would later learn, however, FIS's promises and investment were bait to "catch" Spence, and later, if or when it wanted out, FIS could "kill" the startup by refusing to move forward with the partnership, even after the parties agreed on the material terms.

6.     Indeed, prior to agreeing to the terms of the partnership, the parties engaged in extensive due diligence and negotiations.  Eventually, after months of back and forth, clearance from FIS's outside counsel, and approval from the highest levels of FIS's executive management—including FIS's President and its Chief Legal and Corporate Affairs Officer—the parties agreed that "Spence will serve as FIS' exclusive preferred provider for [FIS's subsidiary] Worldpay globally on cannabis deals."  FIS specifically agreed to be "the exclusive payments provider of Spence, given a right of first refusal on delivering the services of any Spence payment

needs."  The parties agreed that they would "both deliver their services 'at cost,' and will split economics" that remained—*i.e.*, "50/50 revenue share on all net revenue."  To be sure, the partnership agreement offered a blue-sky opportunity to capitalize on an untapped industry worth billions.

7.      With the commercial terms in place and an anticipated sizeable investment in Spence, FIS began publicly touting its partnership to the market.  At the largest global cannabis business conference, for example, FIS hosted a launch party to announce its deal with Spence, explaining that the public company and startup would collaborate to provide a variety of digital payment products to the cannabis industry.  FIS's own executives, including the Global Head of Strategy and Growth at Worldpay, designed and distributed partnership merchandise and materials to further promote the partnership to the key cannabis executives in attendance.

8.      Following the business conference and launch party, and in furtherance of the partnership announcement, FIS also launched a dedicated FIS-Spence partnership website which explained that "[t]hrough our combined capabilities, we're offering a transparent, fully integrated suite of digital payments.  We've built solutions that work for today's regulations and will evolve to meet the needs of tomorrow."  FIS specified that the partnership offered cannabis providers with several digital payment methods, including "Real Time Payments," "Buy Now Pay Later," and "Instant Pay-with-Wallet."  The website also explained that FIS had "built a dedicated cannabis team, [which] aims to help navigate this complex regulatory environment and build compliant and transparent payment solutions the industry needs."

9.      To ensure word of the partnership reached the right audience from the conference, FIS also emailed nearly one hundred leaders in the cannabis industry using Spence's specially curated list of contacts.  In response to its media blitz, potential customers and partners started

reaching out to Spence to discuss possible collaborations. For example, Spence received offers from one of the country's largest cannabis venture capital firms and one of California's largest cannabis delivery companies, which requested to integrate with Spence to gain access to the specific payment products announced by FIS. The parties even began taking meetings together, including with a large cannabis e-commerce company, to explore possible third-party integration opportunities.

10.     And to get FIS up to speed, Spence provided FIS with all of its proprietary information and research on the cannabis industry. Spence also began introducing FIS to its partners, including banks, compliance networks, and technology integration platforms. FIS, in turn, gave Spence access to its payment platform sandbox (a virtual testing platform), to make sure the products would integrate seamlessly with FIS's payment infrastructure.

11.     Relying on FIS's representations, and in order to capitalize on these opportunities and develop the partnership products announced by FIS, Spence began making material changes to its business, paused all other projects, and dedicated the entirety of its resources to developing its partnership with FIS. Spence spent countless hours and millions of dollars on coding and engineering to build out a new infrastructure to accommodate the new "card-first" products and platform, which would only be possible through a partnership with FIS.

12.     To support the partnership, Spence also incurred substantial fees evaluating the legality of the partnership products in each state, contracted with cannabis-focused regulatory and compliance platforms to develop solutions to ensure Spence and FIS could adequately manage risk, and built out new internal governance policies to support the partnership. Spence also dedicated significant resources to sourcing new customers for the partnership. All of this required

several new hires, including a Vice President of Compliance, Chief Technology Officer, Vice President of Sales, Vice President of Product, and several supporting team members.

13.     Yet in the midst of Spence's substantial efforts—and only after Spence shared its blueprints to the cannabis industry and introduced FIS to many key industry players—FIS began its slow and evasive exit towards repudiation.  At first, FIS tried avoiding Spence with some of Spence's emails going unanswered for weeks.  Then, after persistent follow up, Spence finally received confirmation from an FIS Senior Vice President that, despite the prior silence, there were no internal "macro issues" to report.  Relying on this statement, and others like it, Spence continued to work towards the partnership, including building out the partnership products that FIS promoted to the market.  Unfortunately, FIS honored neither its assurances nor its representations to Spence.

14.     Indeed, as Spence would later learn, there were in fact many "macro issues" occurring behind the scenes at FIS.  Following a plunge in FIS's stock (which wiped out billions of dollars in market capitalization), the departure of FIS's CEO, and FIS terminating thousands of employees, and just days after FIS's no "macro issues" statement to Spence, FIS announced that Worldpay would spin off as a separate entity.  Worldpay was, however, the company's payments processing and merchant services division—the same group that Spence had largely been working with at FIS.

15.     According to FIS's new CEO, the spinoff "will enable FIS to target a strong investment-grade credit rating, while allowing Worldpay to invest more aggressively for growth." In other words, FIS was shifting towards a conservative model to build its credit rating, and cutting ties with what it perceived to be riskier industries; Spence (and other startups like it) was abandoned.  FIS never made Spence aware of any of these issues or shifts in strategy.

16.     Shortly after the announcement, and days after informing Spence that there were no issues preventing it from moving forward, as well as outwardly demonstrating that FIS was working towards the partnership, FIS made its true intentions clear—it was repudiating the parties' partnership agreement.  FIS offered a host of pretextual and conflicting reasons including that "Spence's application for a merchant account with Worldpay was declined.  This decline was handed down from our compliance, legal, and risk & controls team, and was decided ***due to an unsupported business model that violated the current FIS cannabis policy***."  This purported explanation was nonsensical given FIS's extensive due diligence and lengthy negotiations, approvals from FIS leadership, creation of a dedicated cannabis team, a substantial investment in Spence, FIS's public announcement and promotion of the partnership, and its many representations to Spence.  Claiming, after the fact, that it will not do any business with Spence because of a previously undisclosed "cannabis policy" is patently absurd.  And even if such a policy did exist (which is unlikely under the circumstances), it is clear evidence of the falsity of FIS's many misrepresentations to Spence that FIS could and would provide Spence with the ability to process payments in the cannabis space as FIS's exclusive partner.

17.     Indeed, on the same day it repudiated, a Worldpay Senior Director represented to Spence that "Cannabis is still a high priority for us.  We still have dedicated team members and leadership is still on board to win in this vertical"—just not with Spence.  And as the Global Head of Strategy and Growth at Worldpay stated to Spence, Worldpay is a multi-billion-dollar financial powerhouse subsidiary that does not "need" Spence.  After leveraging Spence to secure a foothold in the market and acquire crucial information and contacts, FIS kicked Spence to the curb, while the newly spun-off Worldpay could pursue the same cannabis opportunities that the parties had

agreed to partner on, just by itself, or with another partner under more favorable terms or circumstances.

18.     The impact of FIS's repeated misrepresentations and eventual repudiation have been disastrous to Spence's business and reputation.  As a result of FIS's actions, Spence—which had reworked its business model, spent substantial resources building the partnership products announced by FIS, and provided FIS with equity in Spence under generous terms—was forced to turn down all the business opportunities that followed the announcement, lost or terminated employees that were hired to accommodate the partnership, lost its existing and long-standing partnerships (including with its sponsor bank), and suffered substantial reputational damage.

19.     By relying on FIS's many broken promises and misleading or false representations, and as a result of FIS's material breaches of the parties' agreement, Spence had no choice but to close and liquidate.  Then, in furtherance of its scheme, FIS (as a Spence shareholder following its investment) voted against a proposed sale of substantially all of Spence's assets to a viable acquirer, ensuring that the assets would not help give rise to another competitor.

20.     Accordingly, Spence brings this suit to hold FIS accountable and recover its damages.

## PARTIES

21.     Plaintiff Emerging Industry Technologies, Inc. d/b/a Spence Labs is a corporation organized and existing under the laws of Delaware with its headquarters at 910 W. Van Buren St., Suite 100-317, Chicago, Illinois 60607.

22.     Defendant Fidelity National Information Services, Inc. is a corporation organized and existing under the laws of the state of Florida with its headquarters at 601 Riverside Avenue, Jacksonville, Florida 32204.

9

23. Defendant Worldpay, Inc. is a wholly owned subsidiary of Fidelity National Information Services, Inc. and is a corporation organized and existing under the laws of the state of Ohio with its headquarters at 8500 Governors Hill Drive, Cincinnati, Ohio 45249.

## JURISDICTION AND VENUE

24. The Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity between Spence and FIS, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

25. The Court has personal jurisdiction over Defendants because they regularly conduct business in the State of Illinois, and because the acts complained of herein occurred within the State of Illinois.

26. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because Spence had its operations in the Northern District of Illinois and a substantial portion of the events giving rise to Spence's claims occurred in this district.

## FACTS

### I. SPENCE BUILDS A ONE-OF-A-KIND BUSINESS FROM NOTHING

27. As legalization of cannabis has expanded across the United States, many states have benefited from a significant new revenue stream. Illinois, for example, received nearly $450 million in tax revenue from $1.5 billion in recreational marijuana sales in 2021. According to Governor Pritzker, "[t]he $1.5 billion in sales of adult-use cannabis in Illinois translates into significant tax revenue with a portion of every dollar spent being reinvested in communities that have suffered for decades." Similarly, at a national level, medical and recreational cannabis sales are expected to top $30 billion by the end of 2023, and by 2027, retail cannabis sales are projected to surpass $50 billion.

28.     However, because cannabis is not yet legal at a federal level, many dispensaries do not currently accept or employ traditional merchant services.  As a result, dispensaries often deal exclusively in cash, which is both inefficient and dangerous.  Spence's mission was to change that by providing compliant payment alternatives to legal dispensaries and merchants through secure and transparent electronic payment platforms.

29.     Spence, a Chicago-based cannabis fintech startup, first opened its doors in 2019, was officially incorporated in 2020, and processed its first financial transaction at a dispensary in Illinois in August 2020.  Spence's co-founder, Christopher Rentner, a Navy veteran, started Spence after first working with Burling Bank (which later became Spence's sponsor bank) on digital strategy.  Mr. Rentner recognized that banks were processing significant amounts of cash for dispensaries and saw the need for a safer and more practical digital alternative.

30.     By partnering with sponsor banks (like Burling Bank), Spence's first product was to provide dispensaries with Automated Clearing House ("ACH") contactless payment capabilities.  Essentially, Spence would act as an intermediary between two banks for the electronic transfer of money.  Customers could pay online in advance (*i.e.*, preauthorizing the transaction) or in person using their mobile device.  Moving to digital payments under Spence also offered other benefits to dispensaries.  For example, Spence directly integrated with businesses' point-of-sale, e-commerce, and loyalty platforms to provide seamless transactions to customers.

31.     As FIS would later announce, through their partnership Spence would also offer several other payment solutions including Buy Now Pay Later and Instant Pay-with-Wallet (or "Card Not Present") payment technologies.  Buy Now Pay Later is a type of installment loan that divides payments into multiple equal payments with the first due at checkout and the remaining billed to the consumer's debit card until the purchase is paid in full.  Instant Pay-with-Wallet offers

consumers the ability to make purchases without a card physically present (*i.e.*, without tapping, swiping, or inserting a card) and instead transact through a virtual wallet that could be funded in advance or in real time using the consumer's debit or credit card (similar to the digital wallet and phone application popularized by Starbucks). All of these products—facilitated through FIS's platform—would be game-changing for the cannabis industry.

32. In fact, as many industry insiders have remarked, Spence was one of the first to introduce the Buy Now Pay Later concept to the market. As FIS recognized in a December 2021 blog post, "Buy now, pay later (BNPL) is one of the many technological innovations that caught popularity over the past several years . . . . BNPL payments schemes are set to more than double in payment market share growth by 2024, making it the fastest growing payment option." And unlike its few competitors, Spence was able to execute on the Buy Now Pay Later idea in a compliant manner because it had passed extensive regulatory audits. Spence's relationship with FIS (or at least the one that was agreed-upon) would have taken Spence, an already successful startup, to the next level.

33. At FIS's direction, Worldpay would largely handle the relationship with Spence. In July 2019, Worldpay became a Fidelity National subsidiary following a $43 billion acquisition. Together, the combined FIS provides global e-commerce and payment technologies to financial institutions and businesses and, in recent years, has become the largest processing and payments company in the world. Worldpay in particular touts itself as one of the world's largest global merchant acquirers that specializes in consumer transactions and offers technology platforms that integrate payment technologies to streamline and manage payment processing.

34. Together, Spence and FIS (through Worldpay) planned to capture the burgeoning legal cannabis industry and untapped payments processing market, or at least that is what Spence

was led to believe.  With charges per transaction ranging somewhere between 3.95% to 6.95% (depending on whether the product was Buy Now Pay Later or Instant Pay-with-Wallet), FIS and Spence were expecting to readily make net margins of at least 120 to 150 basis points per transaction across billions of dollars in annual transactions thereby netting hundreds of millions in yearly revenue.

## II.     SPENCE AND FIS CONDUCT LENGTHY NEGOTIATIONS AND DUE DILIGENCE

35.     In and around late 2021, FIS began discussing the possibility of acquiring Spence following conversations between Rob Lee, FIS's President of Impact Ventures (the venture capital division of FIS), and Mr. Rentner.  Mr. Lee, recognizing Spence's promise as a new and cutting-edge company, was excited to have Spence's revolutionary technology and Mr. Rentner (with whom Mr. Lee previously worked), under the FIS banner.  At first, Mr. Lee raised the idea of potentially acquiring Spence for $15 million (even at Spence's early beginnings), and putting the company in FIS's Innovation Ventures (FIV) Entrepreneur in Residence Program.  Through the program, FIS would build Spence up to be FIS's internal cannabis technology platform.

36.     Around the same time, FIS also began looking to build out its internal cannabis and CBD team.  In or around October 2021, for example, FIS posted a job opening for a senior strategy manager to lead the new team.  According to the post (as reported by Business Insider), FIS stated that "Cannabis and CBD is a new, high growth space for payments, so you will be crucial in preparing FIS on an operational and strategic level.  You will help define the product roadmap, legal requirements, onboarding requirements, marketing plans, and key accounts to win on a global scale."

37.     A few months later, in or around early May 2022, discussions shifted to FIS partnering with Spence, which would act as FIS's arm's length operator in cannabis.  Mr. Lee,

who mainly handled FIS's investments, then connected Mr. Rentner to senior-level Worldpay executives. According to Mr. Lee, FIS would invest in Spence if the business side (at Worldpay) signed off and wanted to work with Spence on a commercial partnership following the investment.

38.     In or around June 2022, senior-level FIS team members, including Samuel Callen, Vice President, Merchant Strategy at Worldpay, and Eric Queathem, Global Head of Strategy and Emerging Businesses at Worldpay, contacted Mr. Rentner for more information about Spence. After several conversations, they represented that they had mapped out how FIS, Spence, and FIS's sponsor banks and partners (including Fifth Third Bank, Fresno First Bank, and others), could handle cannabis transactions in a fully compliant manner. Essentially, FIS claimed to have cracked the code to card-based cannabis payment processing and Spence was integral to the plan.

39.     To that end, on June 15, Mr. Callen wrote to Spence that "[i]n terms of next steps . . . [w]e'll also circle back to Merchant commercial leadership, including [FIS's President] Stephanie Ferris and [President of Worldpay] Jim J[ohnson], to get their take. We will still have to go back to legal and get their perspective of course as well. Still tracking toward getting to a decision (good or bad) according to the timeline we discussed." A few days later, after Ms. Ferris and Mr. Johnson gave their approvals, the parties began due diligence.

40.     FIS, through its senior legal and compliance executives, began requesting documents, including proprietary documentation relating to Spence's business model, audits, research, and strategies. Spence complied and provided hundreds of pages of documents—in essence, a blueprint and roadmap to the cannabis industry. FIS reviewed these documents and offered positive responses conveying a relationship between Spence and FIS was highly feasible, but first subject to legal and executive sign off.

41.     Then, on or about July 1, 2022, FIS emailed Spence outlining its plan for next steps and attached a document titled "Proposed FIS/Spence Labs Investment & Partnership," which provided high-level terms for a partnership including among other things that FIS would make a "~$5M initial investment" in Spence "at a ~$30-45M pre-money valuation" and FIS would be "Spence's exclusive payment partner for debit and credit card payments" with the companies splitting a "50/50 revenue share on all net revenue" generated.

42.     In the same email, FIS stated that "[i]n terms of next steps . . . Eric to socialize the opportunity next week w/ FIS executives (Jim J, Corp Dev, and Stephanie F) to try and get them on board." FIS also circulated a document titled "FIS & Spence Partnership Workplan Proposal," which it created to detail how "FIS & Spence are coming together in a partnership" which would "enable[] FIS to build market coverage through Spence which is currently operating in the market while allowing it to leverage our payments expertise, global brand and distribution scale." The document also outlined the "FIS-Spence Partnership – Governance Structure" detailing those who would sit on the "Steering Committee," a committee that would "[s]et guiding principles for the partnership," as well as various other committees including "Product & Technical," "Marketing & Branding," and "Strategy & Planning."

43.     Eventually, the "FIS executives" gave the FIS commercial and investment teams their approval to move forward. Confirming that the deal would be largely commercial in nature, on July 20, 2022, Eric Queathem emailed Spence that "we aren't thinking about this as an investment from our venture fund (i.e., the process is different)." Mr. Queathem later agreed with Mr. Rentner when he suggested the two should "plan to talk about how we can start working on the commercial agreement as that will take some time I am sure as well as a diligence list so I can get my team working on it."

15

44.     For the next several weeks, the parties engaged in extensive due diligence and negotiations, including discussions with Spence concerning its integration partnerships, prospective customers, compliance providers, and legal team.  Spence also continued to provide documents pursuant to FIS's requests, including by uploading over fifty categories of documents to a data room.

45.     As part of that due diligence, Spence was contacted by FIS's outside counsel, Venable LLP.  According to FIS, Venable had expertise in cannabis regulatory and legal issues, and with their approval, the partnership could proceed.  The law firm conducted a thorough review of Spence, including several interviews with Spence's team following the completion of an extensive questionnaire document.  Spence also turned over additional proprietary documents, including legal memoranda on the cannabis fintech industry, marketing materials, and information about Spence's top merchants and customers.  The law firm also interviewed and requested documents from Burling Bank, Spence's sponsor bank.  Before the meeting, Spence instructed Burling Bank to provide FIS and Venable with all information related to its strategies, as Spence itself had done already.

46.     Eventually, in early September 2022, Venable reported to FIS that there were no issues with investing in or partnering with Spence.  And with Venable's approval, FIS was ready to move forward with the partnership pending final executive sign-off.  Later, on September 21, 2022, Mr. Queathem texted Mr. Rentner that FIS's President "Stephanie Ferris and Caroline [FIS's general counsel] signed off last night" and the parties can "start the docs . . . ."

## III.    SPENCE AND FIS MEMORIALIZE THE PARTNERSHIP AGREEMENT

47.     Throughout the negotiation process, Spence exchanged hundreds of communications with FIS, such as video calls, phone calls, text messages, and in-person meetings, including several in Chicago.  Eventually, with executive sign-off, FIS volunteered to draft and

circulate a multi-page document outlining the agreed-upon terms of the business relationship between Spence and FIS (the "Partnership Agreement").

48.     After days of further negotiations, the parties eventually settled on the material terms of the Partnership Agreement.  On September 30, 2022, FIS, through its Vice President Samuel Callen, circulated a document that FIS created, titled "Commercial Terms – Spence v.3" reflecting the parties' negotiated and agreed-upon terms.  The email's subject line was "Updated Spence Commercial Framework," and Mr. Callen simply stated "Chris – see attached" followed by his email signature.

49.     As agreed upon by the parties, the Partnership Agreement explained how Spence would "serve as FIS' exclusive preferred provider for Worldpay globally on cannabis deals," in which Spence would have the "first option" for all FIS clients globally.  Further, the parties agreed, among other things, on what products the partnership would offer, the revenue allocation, the geographies in which the partnership would operate, and the length of the Partnership Agreement.

50.     The Partnership Agreement, for example, explained that Spence and FIS would "both deliver services 'at cost' and will split economics," as it relates to products like "Buy Now Pay Later" and "Instant Pay-with-Wallet."  The "cost basis and revenue share calculation" was detailed in "section 9" which described the various "Card Type and Other Services" (such as "Visa/MC/Discover (United States)" and "EBT") and how each would be "Charged Per Transaction" anywhere from "$0.06 plus 0.15% on gross bankcard volume" for "Fleet Cards" to "$0.095" for "PIN and Interac Debit."

51.     According to the Partnership Agreement, Spence would be "FIS' preferred global provider w/ right of first option to go after any client globally," "FIS will be the exclusive payments provider of Spence, given a right of first refusal on delivering the services of any Spence payment

needs," and "Spence will serve as FIS' exclusive preferred provider for Worldpay globally on cannabis deals. FIS will facilitate introductions to new clients for prospective business opportunities."

52.     The deal would "serve for 5 years with a 2 year rolling extension" and "[u]pon termination of the partner contract, FIS [would] be paid in full for rev-share associated with all revenue rights obtained during the contracted term (i.e., any referral revenue tied to BNPL [Buy Now Pay Later], digital wallets, etc.) for all referred merchants." The Partnership Agreement further detailed the various global "Geographies Covered," including the U.S. and Canadian markets. The Partnership Agreement also included a "Referral business/program" in which "[r]eferral fees are paid for the entirety o[f] the merchant contract term, for duration of the active partnership contract."

53.     Indeed, with a manifestation of agreement and mutual assent by the parties on the material terms of the Partnership Agreement, which were clear, definite, and complete, the parties stated that, as a formality, they would move these terms into another document that FIS would also put together. Nevertheless, both parties agreed and understood that there was a Partnership Agreement and the partnership could move forward. Both Spence and FIS knew that they would each begin working to build the partnership, publicly announce the partnership to the market before year end, and launch their new partnership products around April 2023.

54.     Spence, for example, spent countless hours during the weeks and weekends to code and engineer the new products that the partnership would offer. Spence also began searching for and ultimately hired a Vice President of Sales, Chief Technology Officer, Vice President of Product, Vice President of Compliance, and various supporting members. Notably, retention of a

dedicated compliance officer, and supporting staff, was one of the remediation efforts required of Spence under both the investment and commercial deals.

55.     FIS similarly began internally preparing for the partnership.  For example, the company began discussing its "go-to-market" strategy with Spence in a presentation titled "Spence GTM strategy."  In the presentation, FIS noted how "Only MRB [marijuana-related business] companies are within scope for the partnership; CBD/Hemp related businesses and Ancillary Services remain Worldpay only clients unless customers prefer otherwise."  The presentation also explained how, the "Project [would] kick off week of Nov 21st (post MJBizCon)"—the Marijuana Business Conference, also known as MJBizCon, is the world's largest cannabis business conference.

56.     Consistent with that presentation, and with the terms of the Partnership Agreement in place, the parties agreed to announce the joint venture at MJBizCon and a separate FIS-sponsored event.

## IV.     FIS SECURES FURTHER COMMITMENTS FROM SPENCE THROUGH AN INVESTMENT

57.     Of course, agreeing to partner on a commercial level with Spence was not enough to ensure that, if (or when) FIS eventually repudiated, Spence could not move on and partner with an FIS competitor—FIS would also need Spence to agree to several company-altering commitments and restrictions.  Among others mandates, FIS claimed that it required Spence to make several substantial business remediations and give FIS a majority of its preferred shares, with an ability to block any change of control or sale of assets.

58.     To secure these commitments and further embed itself in Spence, in parallel with the parties negotiating the commercial Partnership Agreement, they also negotiated an FIS investment in Spence.  The investment carried, among other things, restrictions on Spence's ability

to conduct business with FIS competitors without notifying FIS over a month in advance, and gave FIS a first offer right on any future acquisitions of Spence. Nor could Spence enter any agreement, contract, or understanding that would in any way restrict FIS's activities unless FIS was also party to that agreement, contract, or understanding. Spence would also need to provide a right of first refusal with respect to any Spence shares to be transferred by current and future employees holding one percent or more of Spence's common stock. And before any person could sell common stock, they would need to give any major investor in Spence (*i.e.*, FIS) an opportunity to participate in such a sale.

59.     Recognizing that no company would agree to such terms under a typical arm's length investment, FIS promised Spence that if it agreed, Spence would be rewarded through the profitable Partnership Agreement with FIS. FIS continuously assured Spence that FIS would "take care" of Spence if it accepted these investment terms.

60.     By September 2022, Spence had no reason to believe FIS's promises of a lucrative partnership were not genuine as the parties had already agreed to the material terms of the Partnership Agreement. On or about October 24, 2022, for example, Mr. Rentner met with Stephane Wyper, SVP of FIS and Global Head of Venture Investment, where Mr. Rentner voiced his concerns over the investment conditions. Mr. Wyper assured Mr. Rentner that the generous commercial terms and profits Spence would earn through the commercial partnership would more than outweigh any restrictions or remediations required by the investment deal. Mr. Wyper's statements were seemingly supported just a few weeks later by others at FIS when, in November 2022, FIS began a steady stream of public promotion of the FIS-Spence partnership.

61.     In the lead up to the closing of the investment in December 2022, FIS emphasized that the purpose of its capital injection was so that Spence could build up its infrastructure in

anticipation of the partnership roll out. To that end, the investment term sheet contained a host of business remediations that Spence needed to undertake (the same or substantially similar remediations that were later requested under the commercial deal). The remediations required Spence to, among other things, make significant changes to its corporate structure, policies and procedures, and business model.

62.     As FIS employees confirmed, FIS would not make an investment in, or require remediations from, a startup that FIS would not partner with on a commercial level— *i.e.*, FIS's investment team followed the commercial team's decisions. In other words, with the FIS commercial team having reached an agreement with Spence regarding the commercial partnership, it gave the FIS investment/venture capital team the greenlight to invest millions in Spence.

63.     Ultimately, FIS agreed to invest up to its maximum investment threshold ($5 million, which was later decreased to $4.5 million dollars when a Spence investor invoked its preemptive rights), and the parties entered into a term sheet on November 3, 2022, followed by a "Series Seed Preferred Stock Purchase Agreement" and side "Letter Agreement" on December 16, 2022. Notably, FIS was so excited about Spence that, according to FIS, its $4.5 million investment was the first time the company was the lead investor on a deal rather than a follow-on investor.

64.     As a result of FIS's promises and continued assurances regarding the commercial partnership (as well as FIS's conduct reflecting its commitment to the partnership), Spence agreed and its employees worked tirelessly to satisfy all of FIS's demands. Only once the remediation demands were completed would FIS reveal that it would not honor its obligations under the Partnership Agreement. By then, however, it was too late. Spence had given FIS certain rights and a large portion of its equity and made changes to its business that were tailor-made for a partnership with FIS.

## V.  FIS PUBLICLY ANNOUNCES ITS PARTNERSHIP WITH SPENCE TO THE MARKET

65.     On or about November 15, 2022, following months of rigorous due diligence, numerous promises, a signed term sheet for a multi-million-dollar investment, and carefully negotiated commercial terms, FIS made an announcement at MJBizCon announcing its partnership with Spence.  According to FIS, the event "marked the launch of our joint efforts with Spence."

66.     Before the conference, FIS created and circulated a document to ensure the parties were aligned on messaging.  The document, titled "MJBizCon Prep & Messaging Worldpay / Spence," explained how FIS would showcase that it is "committed to supporting cannabis merchants across legal markets with payments solutions."  As FIS explained, "Spence is the cannabis industry's most trusted payment platform - offering innovative financial technology, comprehensive integrations, and embedded digital payment capabilities.  Spence's suite of custom designed payment technologies offers robust flexibility to B2C and B2B transactions while fully accommodating the challenges of the cannabis industry's unique requirements."

67.     On the "ABOUT OUR PARTNERSHIP" slide, FIS explained "What we *can* say" includes that "***Worldpay and Spence are partners***."

68.     The "What we *cannot* say," section emphasized that FIS "does not OWN Spence. We do not discuss anything related to investment, or any dollar amounts."  As FIS stressed to Spence on calls, the focus of the announcement was the *commercial* Partnership Agreement.  FIS explained that it did not want word of the *investment* to become public as FIS's public institutional shareholders may take issue with an investment in a cannabis-focused company.

69.     Under "What we *can* say," FIS also included the message that "Together, we're offering a compliant and transparent, fully integrated suite of digital payments, including: CP & CNP Debit & Credit (Canada), ACH (US), BNPL (US), Instant Pay-with-Wallet (US)."

According to FIS, Spence and FIS were "building solutions that work for today's regulations and will evolve to meet tomorrow's industry needs. We are pursuing a number of opportunities to expand capabilities in the future."

70.     On the "FAQ" section, FIS noted that when asked "What does this partnership mean?" the parties would explain that "Worldpay and Spence share many of the same aims. We're pleased to partner as we build a compliant payment ecosystem that supports the US cannabis industry. Together, we're building solutions that work for today's regulations and will evolve to meet tomorrow's industry needs." As FIS explained, "Our partnership allows Worldpay to expand their capabilities in the US today, with ACH, BNPL and Instant Pay-with-Wallet solutions, while we continue to map out solutions to meet the needs of the market in future."

71.     To announce the event, FIS hosted and planned a cocktail party that included a number of co-branded materials, including signs, hoodies, and table toppers, most of which were designed at the direction of Eric Queathem, FIS's Global Head of Strategy and Emerging Businesses at Worldpay. FIS also sent out electronic invitations to key cannabis executives, which teased the announcement of a "very special collaboration" between FIS and Spence. The parties agreed to split the costs of the party.

72.     As shown in the picture below, several senior members of FIS's team attended including Samuel Callen, Eric Queathem, Holly Worst, and Alexandra Maxwell—all proudly displaying their co-branded FIS-Spence sweatshirts.



73.     In furtherance of the partnership announcement, FIS also launched a dedicated partnership website (https://wpfisglobal.com/retailpayments/) a few days after the launch event, which boasted how "Worldpay and Spence have aligned to deliver conventional payment methods to the cannabis industry."   FIS confirmed that the website had been reviewed and approved by FIS's legal team.



74. Until on or about July 6, 2023—the same day that FIS announced its "acceleration of its previously announced separation plan" with Worldpay—the website was live and proudly touting the Spence-FIS partnership. The website was particularly noteworthy because for other larger deals and partnerships (like when FIS partnered with Affirm), FIS did not create unique and specialized websites. Indeed, FIS's extensive promotion of the partnership and Partnership Agreement only further supported the commitments to Spence that FIS promised during negotiations.

75. As the website stated, "[t]hrough our combined capabilities, we're offering a transparent, fully integrated suite of digital payments. We've built solutions that work for today's regulations and will evolve to meet the needs of tomorrow." According to the site, the partnership's "Current Global Capabilities" included "Buy Now Pay Later, ACH and Real time payments, Instant Pay-with-Wallet."



76. FIS further elaborated that, with their partnership, Spence "Offers" and "Currently [is] working in the US MRB [marijuana related business] space [to] provide[] dispensaries with" several payment capabilities, including "Real Time Payments," "Buy Now Pay Later," and

"Instant Pay-with-Wallet"—all capabilities that would only be possible through the Partnership Agreement.



77. The website also noted that FIS "built a dedicated cannabis team, [which] aims to help navigate this complex regulatory environment and build compliant and transparent payment solutions the industry needs." As discussed below, to this day FIS still maintains their "cannabis team," just without Spence.

78. To ensure that word of the Partnership Agreement reached the right audience at the business conference, FIS used a list of Spence's contacts to email about one hundred important leaders in the cannabis industry. And before the event, Samuel Callen requested that Spence "include me as optional for some of those chats if you guys get a call going? More just for my own knowledge/understanding of who the important players are in the space." Mr. Callen followed up

weeks later, that he "[w]anted to reach out to see if you had any folks you'd recommend I should aim to connect with during the week of MJBizCon.  Also happy to ride along on any meetings you might already have scheduled.  Still fairly new to the whole vertical, so happy to take your steer on any connections you think would be beneficial to make."

79.     The post-launch email sent by FIS recapped that the event "marked the launch of our joint efforts with Spence to deliver conventional payment methods to the cannabis industry, across North America."  "To find out more about how Worldpay from FIS & Spence have aligned," recipients were encouraged to visit the FIS-hosted partnership website.



80.     Before the launch event, and pursuant to Mr. Callen's request, Spence also began making introductions to key industry executives and potential partners.  For example, in or around October 17, 2022, the two companies presented a co-branded presentation to a large cannabis e-commerce company that explained how FIS and Spence had created a "Global Financial Services Partnership for Cannabis."  The presentation added how "[t]ogether, FIS & Spence are providing a compliant & transparent FUTURE PROOF payments ecosystem which supports the highly regulated cannabis industry."  The presentation even provided anticipated product launch dates, including "US Debit Card for eCommerce & BNPL-2023 1H."

81.     Encouraged by FIS's promotion pre- and post-launch, Spence also reposted the website on its social media accounts.  The below LinkedIn post promoting the FIS and Spence "combined capabilities," for example, was "liked" by Brian Fisher, Senior Business Development Manager of Enterprise Digital Content at Worldpay and Holly Worst, Senior Director, Vertical Growth of Retail, Grocery, and Cannabis at Worldpay, who also commented, "Exciting times!"



82. As a result of, and relying on, FIS's partnership promotion blitz, Spence pushed to develop the partnership products that FIS announced and the market was now expecting.

## VI. SPENCE MAKES MATERIAL CHANGES AT FIS'S REQUEST

83. Following FIS's announcements, potential customers, merchants, and partners began reaching out to Spence to partner with the new Spence-FIS joint venture. As Spence would later learn, FIS's subsequent repudiation of a partnership that it had once publicly and proudly touted cast a cloud over Spence and, as a result, the opportunities and relationships with those same market leaders were irreparably harmed.

84.     For example, Spence received offers from one of the country's largest cannabis venture capital firms and one of California's largest cannabis delivery companies, which specifically requested access to certain of the payment products announced by FIS. FIS was also leveraging Spence's name and their partnership to gain inroads with potential partners. As described in a December 2, 2022 email from Alexandra Maxwell, a Senior Strategy Manager of Cannabis at Worldpay, FIS "has an opportunity with" a large Canadian e-commerce company needing a "payments partner for their e-comm platform." Ms. Maxwell summarized that in the meeting, "[w]e mentioned our partnership as part of our initial discussion as an option for their US ecomm and would like to bring you into the conversation as it progresses" and noted that "presenting a united front, able to work across both markets, will be key."

85.     Indeed, the market was especially interested in gaining access to the products FIS touted on its website, including "Buy Now Pay Later" and "Instant Pay-with-Wallet." And for good reason. As FIS reported in its "2022 Global Payments Report," (*available at* https://offers.worldpayglobal.com/rs/850-JOA-856/images/ENGPR2022.pdf), Buy Now Pay Later was expected to account for about $438 billion, or 5.3%, of all global e-commerce transaction value by 2025, up from 2.9%, or $157 billion, in 2021, fueled by a strong and growing demand.

86.     Although FIS advertised that the partnership products, like Buy Now Pay Later, were "current" capabilities of the partnership, as FIS knew, Spence was still working tirelessly to build them out. Relying on the market's positive feedback to FIS's announcement, and FIS's continuous representations about the partnership to Spence and potential partners, Spence pushed its employees to work overtime towards building the partnership products.

87.     To facilitate Spence's work, in January 2023, FIS gave Spence access to the company's payment platform sandbox (a virtual testing platform), which allowed Spence to

confirm its products would integrate seamlessly with FIS's global payment ecosystem. FIS also gave Spence merchant category codes, which were used to classify the kinds of transactions being processed.

88. As formal announcements were being made to celebrate their partnership, Spence also continued making several major remediations to its business to support the partnership and as required by FIS as part the commercial and investment deals. As confirmed in a December 13, 2022 letter from Spence's VP of Compliance to FIS, titled "FIS Remediation Confirmation Letter – 12-13-2022," Spence had completed all of the remediations that FIS requested for the commercial deal (which were substantially similar to those required under the investment deal). As explained in the letter, Spence, among other things: (1) revamped the language and content of its website to specify which products and services were currently available or pending availability; (2) provided express certifications of compliance with applicable state cannabis laws on Spence's website; (3) hired a dedicated Vice President of Compliance and contracted with an ACH manager; (4) created a Board Governance Policy which specified how Spence's board reviews and approves certain policies and procedures; (5) underwent a risk assessment and established and executed an ongoing risk assessment strategy; and (6) updated its AML policy to provide a more thorough explanation of how information is collected from cannabis related businesses and include a more detailed explanation of how it monitors for and reports suspicious activity. Indeed, in anticipation of the partnership and in reliance on FIS's representations, Spence was spending millions on recruiting fees, legal fees, development fees, salaries, and hardware purchases, all of which added a substantial amount to Spence's overhead.

89.    In response to the FIS Remediation Confirmation Letter, Eric Queathem, Global Head of Strategy and Emerging Businesses at Worldpay, wrote that the remediations were "amazing."

## VII.    TURMOIL AT FIS

90.    Unbeknownst to Spence, while Spence was spending millions of dollars and countless hours reworking its business and preparing for the launch of the partnership products, FIS was also undergoing substantial changes.

91.    In November 2022, for example, FIS reported that its Merchant Solutions segment (*i.e.*, Worldpay), suffered a "margin contraction of 430 basis points." The news caused FIS's stock to decline nearly 30%, erasing billions in market capitalization. Then, in December, FIS announced a "comprehensive assessment of the Company's strategy, business, operations and structure . . . ." FIS said that it would "focus on identifying and optimizing incremental revenue generation, margin improvement and cost reduction opportunities." FIS also announced that its CEO would "depart" earlier than anticipated.

92.    In the same announcement, Stephanie Ferris—who was promoted to CEO—noted that "[w]e are taking a hard look at every aspect of our company to define areas for change and develop specific action and improvement plans. The Board and I are fully aligned in implementing this comprehensive review of our businesses. Our goal is to optimize FIS for performance and returns while improving the satisfaction of our clients and employees."

93.    A couple of months later, in February, FIS terminated over 2,500 employees and thousands of contractors. Days later, on February 13, 2023, FIS announced that it would spin off Worldpay, and in the process recognize a $17.6 billion write-down. Ms. Ferris stated that the spinoff "will enable FIS to target a strong investment grade credit rating, while allowing Worldpay to invest more aggressively for growth." On an earnings call the same day, Ms. Ferris told the

market that "Worldpay operates in a more dynamic and disruptive end market relative to Heritage FIS . . . [t]he separation from FIS will allow Worldpay to pursue a more growth-oriented strategy." "Central to the growth strategy" she said, "is a return to more consistent M&A and a capital structure that does not require an investment grade rating."

94.     Then, on July 6, 2023, FIS issued a press release, which "announced an acceleration of its previously announced separation plan to create two highly focused global companies with greater strategic flexibility." FIS detailed how it "signed a definitive agreement to sell a majority stake in its Worldpay Merchant Solutions business to private equity funds managed by GTCR [a Chicago-based private equity firm] in a transaction valuing Worldpay at $18.5 billion . . . ." As part of the deal, FIS stated that it would "retain 45% ownership in Worldpay."

## VIII.   **FIS RENEGES ON THE PARTNERSHIP AGREEMENT**

95.     Despite repeated assurances about the existence of, and commitment to, the partnership, FIS—purportedly as part of its review to move away from supposedly "aggressive" investments (*e.g.*, in areas like cannabis)—made the decision to distance itself from Spence, and began a slow walk toward repudiation.

96.     At first, on or about November 11, 2022, FIS sent Spence a draft agreement titled "Spence Referral Agreement." The document outlined a structure where the parties would send potential customers to one another and receive a fee. This structure alone, however, differed from the full terms of the Partnership Agreement the parties had agreed to. The referral arrangement was just one ancillary aspect to the partnership.

97.     On or around January 4, 2023, after weeks of waiting for other draft documents that contained and reflected the main aspects and material terms the parties had agreed to—mainly that "Spence will be FIS' preferred global provider"—Spence sent its own draft.

33

98.     In response, FIS suggested that, instead of the fully agreed-upon Partnership Agreement, Spence and FIS work *solely* under a "referral" framework.  When Spence refused, FIS suggested that if FIS wanted, it could work directly with customers and cut Spence out entirely.  In an attempt to belittle Spence, Eric Queathem boasted that he was busy with his role in a billion-dollar division (Worldpay) that was part of a multi-billion-dollar company.

99.     Spence continued to follow up with FIS but was repeatedly ignored.  Then, days later, apparently retreating from its referral suggestion, and in furtherance of the Partnership Agreement, FIS gave Spence access to the company's virtual testing platform (which would not be necessary under a referral-only arrangement).  On January 9, FIS also emailed Spence about strategy planning for the partnership, including that "our current focus for our set-up will be to utilize Worldpay to process consumer payments over to Spence."

100.    A few days later, on or about February 7, 2023, in response to Spence's concerns over FIS's recent conduct, Elaine Duff, FIS's Senior Vice President of Impact Ventures, assured Spence that there were no "macro issues" preventing FIS from continuing its agreed-upon partnership with Spence.  That statement was false.  FIS knowingly misrepresented that things were copacetic at FIS and otherwise concealed the substantial "macro issues" behind the scenes.  FIS intended, or at least reasonably expected, that Spence would rely on this statement and others like it.

101.    Days later, on February 13, FIS announced the Worldpay spinoff.

102.    Following its discussion with Ms. Duff, and news of the spinoff, Spence sent a series of follow up emails to FIS, including one to Eric Queathem, writing, "[i]t has been a week since my last email and more than a month since I heard from you."  Days later, on February 19, 2023, Mr. Queathem tried to walk back Ms. Duff's comments, conceding that "a lot has been

34

shared/discussed over the last ~9 months," but that "we need to focus on the reality of what Spence is capable of providing today/soon," and that ultimately, "we need to go back to square one." Going back to "square one," of course, made little sense given that FIS had announced the partnership to the market and invested $4.5 million dollars in Spence just a few months earlier. FIS's comment that the parties focus on what "Spence is capable of providing today/soon" also contradicted the partnership's plans to launch the products in mid-2023. As FIS was well aware, Spence was working overtime, and, by February, was well on its way to developing the partnership products FIS had already announced to the market.

103. Spence continued to follow up to understand why FIS was suggesting that the parties abandon their Partnership Agreement and start anew. Finally, on February 28, Mr. Rentner emailed FIS that "we need to move forward with our partnership asap and deliver on what was announced to the market. This delay cannot continue – lack of action may be very detrimental to the future of Spence, even putting the company at risk of complete failure." Mr. Queathem responded, neither denying the existence of the partnership or taking issue with Mr. Rentner's insistence on moving forward with the partnership, but instead copied others on the email to schedule a meeting. Further inconsistent or otherwise erratic communication continued for the next few days.

104. Then, on March 6, 2023, FIS finally made its intentions clear—it was repudiating the Partnership Agreement. Nicole Asling, VP of Enterprise Partners at Worldpay, for example, stated that FIS was only willing to move forward with "potential referral terms" for *non-cannabis* merchants, thereby effectively foreclosing any meaningful business partnership and directly contradicting FIS's own prior representations and document which noted that "*[o]nly MRB* [marijuana-related business] companies are within scope for the partnership."

105.    On the same day, Holly Worst, Senior Director, Vertical Growth of Retail, Grocery, and Cannabis at Worldpay, replied that the "Buy Now Pay Later" product "was declined by compliance" and suggested the parties instead "meet monthly . . . to discuss progression on our end, review your wins and strategy, as well as discuss any potential *referral* deals from both sides as stated below in Nicole's email."  Despite rejecting the Partnership Agreement, Ms. Worst still emphasized that "[o]verall, I want to reiterate that Cannabis is still a high priority for us. We still have dedicated team members and leadership is still on board to win in this vertical."

106.    Then, Brian Fisher, Senior Business Development Manager of Enterprise Digital Content at Worldpay, followed up stating that "Spence's application for a merchant account with Worldpay was declined.  This decline was handed down from our compliance, legal, and risk & controls team, and ***was decided due to an unsupported business model that violated the current FIS cannabis policy***."

107.    The purported basis for this repudiation simply cannot be reconciled with, among other things: FIS's $4.5 million dollar investment in Spence (which was made for purposes of getting Spence to a position where it could become a viable and successful partner for FIS), FIS's promises to partner with Spence, the extensive due diligence from both parties, approval from the highest levels of FIS, approval from FIS's in-house attorneys, approval from FIS's outside counsel, public announcements about the Partnership Agreement boasting Spence's current capabilities and compliant service offering, FIS-prepared documents acknowledging the partnership and discussing detailed business strategies for the partnership, or the joint meetings FIS and Spence took together with prospective clients and collaborators.

108.    Ms. Worst's remarks summarized it best when she explained that, despite the repudiation, cannabis is still a "high priority for" FIS.  In other words, FIS was apparently finally

prepared to implement the plan that Eric Queathem threatened Spence with months before: to move forward in the cannabis financial processing space without Spence. Specifically, FIS, apparently as part of its risk-assessment and strategic review, was attempting to walk back its commitments to Spence. Worldpay, on the other hand, would be spun off and free to explore more "aggressive" opportunities in new payment spaces. And with Spence left for dead, Worldpay could now capitalize on the cannabis payments processing opportunity itself.

109. Indeed, a few weeks after FIS's termination, on April 20, 2023, Alexandra Maxwell, a Senior Strategy Manager of Cannabis at Worldpay, appeared on the Global Cannabis Business Podcast to promote "what solutions are being developed [by Worldpay] to help businesses in the [cannabis] industry tackle them so they can get goods and services moving." On the podcast, Ms. Maxwell explained how she leads the company's "cannabis strategy, globally" and "we built our cannabis program about 12 months ago" (*i.e.*, around the same time Spence and FIS began partnership negotiations). Ms. Maxwell touted how FIS, through Worldpay, "work[s] with 20,000 clients from [ ] coffee shops to large software providers . . . and I'm very thankful to say Cannabis [ ] dispensaries as well." As Ms. Maxwell confirmed throughout her podcast appearance, cannabis is a major focus for the company moving forward.

110. Unfortunately, Spence is not the only company FIS has done this to. Upon information and belief, FIS is also currently trying to walk back its commitments and promises to another startup that reworked its business for its anticipated FIS partnership. Through this lawsuit, Spence seeks to hold FIS accountable and prevent this same pattern and practice from repeating itself and destroying more small, home-grown businesses in Illinois and elsewhere.

## IX.    <u>SPENCE IS FORCED TO CLOSE</u>

111. But for FIS's repeated promises and assurances, Spence would not have worked toward upholding its end of the bargain, including by working tirelessly to build the partnership

products, making substantial remediations to the company, forgoing significant business opportunities to its detriment, handing FIS all of Spence's proprietary information related to the fintech cannabis industry, or accepting FIS's draconian investment terms.

112.    Spence spent countless hours and millions of dollars, reasonably relying on and believing FIS's many promises, representations, and actions.  As a result, Spence oriented its business around the anticipated material revenue from the partnership, which was expected to start around Q3 2023.  Because of FIS's misconduct and repudiation, however, everything Spence built for the partnership was rendered meaningless—Spence dedicated its time and money to a partnership that FIS now refuses to honor.  Essentially, FIS persuaded Spence to commit to only working with FIS, and after Spence fully committed, FIS reneged.

113.    Once FIS terminated the Partnership Agreement, there was no going back for Spence.  And when Spence's employees learned of FIS's repudiation, they began to leave in droves—taking with them institutional knowledge Spence needed to operate.  In fact, upon learning of the issues with FIS, Spence's Vice President of Compliance resigned, citing the "setbacks that we've encountered with FIS" and stating that the "uncertainty that exists now between [Spence] and FIS have convinced me that the path we're traversing is too unclear to . . . provide the value I promised when we agreed I would join Spence to lead the Compliance function."

114.    FIS's repudiation also led to the collapse of a series of relationships between Spence and others who perceived the broken partnership as a signal of a deficiency with Spence.  Spence's sponsor bank, Burling Bank, for example, notified Spence that it would be deactivating Spence's account citing a "change in status and recent developments," including specifically, "continued uncertainty concerning the FIS/Spence partnership," as well as that Spence no longer had a

"compliance and IT team on staff" (which Spence lost as a result of FIS's repudiation). And without the FIS partnership, none of the prospective business partners that Spence had introduced FIS to would do business with the now-abandoned Spence. Spence's reputation was forever ruined.

115.     Ultimately, as a result of FIS's repudiation, Spence was forced to close its business and began winding down, including by letting all of its employees go.

116.     After a competitive asset bidding process, Spence was at least able to find a buyer for Spence's assets. The potential buyer, however, was another payments company. Before the shareholder vote for the sale, FIS advised Spence that "FIS does not intend to approve the proposed Change of Control described in the LOI [letter of intent]." Weeks later, FIS warned Spence that "the transaction described in the LOI must be approved by the holders of at least a majority of the outstanding shares of Preferred Stock of Spence, which majority must include FIS." The company explained, however, that "FIS would be amenable to approving the transaction" if "FIS receiv[es] a general release of all claims against FIS from Spence," which included those in this action. In other words, FIS was attempting to leverage its majority position (which it secured under false pretenses) and threatening to hold the transaction hostage unless Spence acquiesced. When Spence rejected FIS's extortionist offer, FIS voted against the transaction, ultimately ensuring that Spence's assets did not help give rise to another FIS competitor and further destroying Spence's value.

117.     Under the circumstances created by FIS's misrepresentations and breached promises, an asset sale was the only viable option to realize any value of what remained of Spence. For FIS, any such transaction meant that another company could try to continue where Spence left off by trying to capture market share in the cannabis payments space, which would conflict with

FIS's strategy to go at it alone. In turn, FIS sacrificed its investment in Spence to block the transaction and preserve its broader competitive advantage in the cannabis payments space. FIS's catch-and-kill scheme was complete.

118. As a direct result of FIS's misconduct, Spence has been severely damaged in an amount to be proven at trial. Spence's damages include the lost enterprise value of the partnership between FIS and Spence; lost value of Spence; lost profits from the partnership; lost profits from alternative opportunities Spence would have pursued absent FIS's breach; costs and expenses incurred in evaluating and negotiating the partnership; costs and expenses in work performed in anticipation of and in reliance on the partnership; loss of business relationships; and reputational harm.

## **CAUSES OF ACTION**

### **FIRST CAUSE OF ACTION**
**(Breach of Contract/Anticipatory Repudiation)**

119. All of the preceding paragraphs are incorporated by reference as if fully set forth herein.

120. The Partnership Agreement between Spence and FIS is a valid, enforceable, and binding contract. There was a manifestation of the Partnership Agreement and mutual assent by the parties on the essential terms, which are clear, definite, and complete.

121. Before FIS's repudiation, Spence was substantially performing its obligations under the Partnership Agreement and was otherwise ready, willing, and able to proceed with the Partnership Agreement on the agreed-upon terms. Indeed, FIS's attempts to now avoid its obligations under, and deny the existence of, the Partnership Agreement is unconscionable.

122. FIS intentionally and willfully breached the Partnership Agreement and refused to honor the agreed-upon terms, including that:

- Spence would "serve as FIS' exclusive preferred provider for Worldpay globally on cannabis deals," in which Spence would have the "first option" for all FIS clients globally.

- "FIS will be the exclusive payment provider of Spence, given a right of first refusal on delivering the services of any Spence payment needs."

- Spence and FIS would "both deliver services 'at cost' and will split economics," as it relates to the financials products "Buy Now Pay Later" and "Instant Pay-with-Wallet."

- The deal would "serve for 5 years with a 2 year rolling extension" and "[u]pon termination of the partner contract, FIS [would] be paid in full for rev-share associated with all revenue rights obtained during the contracted term (*i.e.*, any referral revenue tied to BNPL [Buy Now Pay Later], digital wallets, etc.) for all referred merchants."

123. FIS unequivocally conveyed to Spence that it would refuse to honor the Partnership Agreement when, among other things, it wrote to Spence that "Spence's application for a merchant account with Worldpay from FIS was declined. This decline was handed down from our compliance, legal, and risk & controls team, and was decided due to an unsupported business model that violated the current FIS cannabis policy."

124. FIS's refusal to perform its obligations under the Partnership Agreement is a unilateral and unjustified termination of the Partnership Agreement.

125. As a result of the foregoing, Spence has suffered, and continues to suffer, substantial damages in an amount to be determined at trial. Additionally, Spence continues to incur monetary damages in connection with enforcing its rights, including attorney's fees incurred in bringing this action.

## SECOND CAUSE OF ACTION
### (Fraudulent Concealment)

126. All of the preceding paragraphs are incorporated by reference as if fully set forth herein.

127.     FIS had knowledge of, and concealed, material facts, including that as part of an effort to salvage or remediate its image in the industry and build its credit rating, FIS would be cutting ties with perceived riskier investments, like Spence, and spinning off Worldpay as a separate entity and/or selling it.  After the parties had agreed to partner and entered into the Partnership Agreement, FIS determined, but failed to disclose, that it was experiencing numerous internal issues, and would not proceed with the partnership and Partnership Agreement with Spence.

128.     FIS knew or should have known that Spence would rely on FIS's concealment, including by continuing to work towards building the partnership products that were announced to the market.

129.     FIS had a duty to disclose, and not conceal, the truth to Spence.  FIS entered into a relationship of confidence and trust with Spence, in which FIS's superior knowledge and experience placed FIS in a position of influence and special trust relationship.  After agreeing to proceed with the partnership, formalizing the Partnership Agreement between FIS and Spence, and announcing the partnership, FIS should have disclosed to Spence that it might not, and later would not, proceed with the partnership.  FIS had unique and special knowledge, including that there were issues preventing it from moving forward and later that it would be cutting ties with Spence.

130.     Additionally, FIS never mentioned a "FIS cannabis policy" or how Spence could have an "unsupported business model" (or what a "supported" business model even looked like).  None of that relevant information was available to Spence.  Nevertheless, FIS remained silent and instead continued to engage in deceptive conduct and suppressed material facts.  FIS through its

actions and words, continued to lead Spence to believe that FIS would proceed with the partnership.

131.    But for FIS's fraudulent concealment, Spence would not have continued to spend substantial resources and capital preparing for and in furtherance of the partnership, including by continuing to develop new products for the partnership with FIS, overhauling existing products and capabilities to create entirely new products and capabilities to suit the partnership, setting up meetings and promoting the partnership, hiring and onboarding new employees, and developing multiple new corporate policies with an eye towards alignment with FIS and the future partnership business.  Spence also relayed and delivered important proprietary information to FIS, including information concerning Spence's top merchant and customers—including banks and compliance networks—along with other potential customer lists, proprietary technology information concerning Spence's mobile payment processing platform, marketing materials, and highly detailed and valuable research on the cannabis industry and competitors.

132.    In addition, because Spence was led to believe it was in a partnership with FIS, which FIS was committed to, Spence was prevented from pursuing and obtaining other business opportunities.

133.    As a result of the foregoing, Spence has suffered, and continues to suffer, substantial damages in an amount to be determined at trial.  Additionally, Spence continues to incur monetary damages in connection with enforcing its rights, including attorney's fees incurred in bringing this action.

### THIRD CAUSE OF ACTION
**(Unjust Enrichment)**
(In the Alternative to the First Cause of Action)

134.    All of the preceding paragraphs are incorporated by reference as if fully set forth herein, except for those in the First and Second Causes of Action.  Solely for purposes of this

claim, allegations concerning the formation of a binding commercial partnership agreement are also not incorporated.

135.    In the alternative, if there is not an agreement between the parties, FIS is liable for unjustly enriching itself at Spence's expense.

136.    Spence provided FIS with several benefits, without compensation.  FIS's use and retention of those benefits violates fundamental principles of justice, equity, and good conscience. For example, Spence delivered proprietary information and other property to FIS, including legal memoranda on the cannabis fintech industry, highly detailed and valuable research on the cannabis industry and competitors, and marketing and strategy materials.  Spence also provided FIS with proprietary technology information, including Spence's mobile payment processing platform. Spence also shared information concerning Spence's top merchants and customers, including banks and compliance networks, along with other potential customer lists.

137.    Indeed, FIS used and leveraged Spence's name and the existence of the partnership—which FIS continued to use and promote on its website well after it rejected the partnership—to gain credibility and access to the cannabis financial technology industry.  Only through Spence could FIS represent to the market that "we're offering a transparent, fully integrated suite of digital payments.  We've built solutions that work for today's regulations."  FIS had not created or offered anything.

138.    The use and retention by FIS of this proprietary information and other property is a benefit and enrichment to FIS and is an impoverishment and detriment to Spence.  With the understanding that the two would be partners, Spence provided a substantial amount of proprietary information to FIS which essentially amounted to a blueprint to the cannabis fintech industry.  In doing so, Spence unknowingly created a competitor that, as FIS threatened, could operate in the

space without Spence. And when it refused to move forward with the Spence partnership, FIS could move on alone with its new industry knowledge and foothold, while Spence was left behind.

139. FIS obtained this information and property under circumstances that would violate the fundamental principles of justice, equity, and good conscience for FIS to retain the benefit of them without compensating Spence.

140. As a result of the foregoing, Spence has suffered, and continues to suffer, substantial damages in an amount to be determined at trial. Additionally, Spence continues to incur monetary damages in connection with enforcing its rights, including attorney's fees incurred in bringing this action.

<u>**FOURTH CAUSE OF ACTION**</u>
**(Promissory Estoppel)**
(In the Alternative to the First Cause of Action)

141. All of the preceding paragraphs are incorporated by reference as if fully set forth herein, except for those in the First and Second Causes of Action. Solely for purposes of this claim, allegations concerning the formation of a binding commercial partnership agreement are also not incorporated.

142. In the alternative, if there is not an agreement between the parties, FIS is liable for the promises it made to Spence that Spence reasonably and foreseeably relied upon to its detriment.

143. FIS made several unambiguous promises to Spence. FIS reassured and promised to Spence in several different ways that there was a partnership—which FIS represented had been approved by executive and legal personnel—in which Spence would build certain products that would leverage FIS's platform. For example, ahead of FIS's public announcement, FIS circulated a document confirming and assuring Spence that "Worldpay [FIS's subsidiary] and Spence are partners." Additionally, on several occasions, FIS promised that it would "take care" of Spence as its partner.

144.    Spence relied on these promises and spent substantial resources and capital preparing for and in furtherance of the partnership.  Among other things, Spence spent money and resources on: developing new products for the partnership with FIS, overhauling existing products and capabilities to create entirely new products and capabilities to suit the partnership, setting up meetings and promoting the partnership, hiring and onboarding new employees, and developing multiple new corporate policies with an eye towards alignment with FIS and the future partnership business.  Further, forgoing all other potential opportunities, Spence fully committed to the partnership with FIS.  FIS's attempts to now avoid its obligations under those promises is unconscionable.

145.    Additionally, Spence, in reliance on these promises, also relayed and delivered important proprietary information to FIS, including legal memoranda on the cannabis fintech industry, marketing materials, information concerning Spence's top merchants and customers—including banks and compliance networks—along with other potential customer lists, proprietary technology information concerning Spence's mobile payment processing platform, and highly detailed and valuable research on the cannabis industry and competitors.

146.    Spence's reliance on FIS's promises was reasonable and foreseeable.  FIS, for example, publicly touted its partnership with Spence and even launched a website detailing the nature of their newfound partnership.

147.    As a result of the foregoing, Spence has suffered, and continues to suffer, substantial damages in an amount to be determined at trial.  Additionally, Spence continues to incur monetary damages in connection with enforcing its rights, including attorney's fees incurred in bringing this action.

**FIFTH CAUSE OF ACTION**
**(Fraudulent Inducement/Misrepresentation)**
(In the Alternative to the First Cause of Action)

148.    All of the preceding paragraphs are incorporated by reference as if fully set forth herein, except for those in the First and Second Causes of Action.  Solely for purposes of this claim, allegations concerning the formation of a binding commercial partnership agreement are also not incorporated.

149.    In the alternative, if the commercial deal is not an enforceable agreement, as FIS has recently suggested, then Spence has been the victim of fraud based on FIS's numerous misrepresentations and omissions of material facts concerning its intention to enter into such an agreement and the existence of the agreement.

150.    Among other misrepresentations, FIS assured Spence that it would enter into (and Spence would be rewarded through) a partnership agreement with Spence, despite having no intention to do so.  FIS went as far as claiming that it would enter into a commercial agreement if Spence made several substantial remediations and accepted the terms of the investment deal.  For example, Stephane Wyper, SVP of FIS Global Head of Venture, represented and assured Spence that the generous commercial terms and profits Spence would earn through the commercial partnership would more than outweigh any restrictions or remediations required by the investment deal.

151.    FIS, on several occasions, also misrepresented that a commercial partnership was approved internally by FIS's executives and externally by FIS's counsel, and could move forward.

152.    FIS then, through its actions and words, misrepresented that there was a partnership in place that it intended to honor, including by launching a website declaring a partnership, hosting a launch party for the partnership, sending emails to key cannabis executives boasting about a

partnership, holding meetings with potential clients as partners, generating and circulating several partnership planning documents, and promising that, among other things, "Spence will be FIS' preferred global provider w/ right of first option to go after any client globally" and that "Spence will serve as FIS' exclusive preferred provider for Worldpay globally on cannabis deals."

153. FIS, wanting to break into the cannabis financial technology industry, made such misrepresentations and omissions of material facts knowingly and with the intent to induce Spence, who already had a strong foothold in the market. Among other things, FIS induced Spence to relay and deliver important proprietary information concerning the cannabis industry, including legal memoranda on the cannabis fintech industry, marketing materials, information concerning Spence's top merchants and customers—including banks and compliance networks—along with other potential customer lists, proprietary technology information concerning Spence's mobile payment processing platform, and highly detailed and valuable research on the cannabis industry and competitors. In order to gain access and credibility in the cannabis space, FIS also induced Spence into allowing FIS to use Spence's name and permitting FIS to boast to the market that the two were collaborating to build state-of-the-art new cannabis payment products.

154. FIS also made such misrepresentations and omissions with the goal of embedding itself in Spence and preventing Spence from partnering with any FIS competitors. Indeed, as FIS confirmed, cannabis is still a "high priority for" the company—just not with Spence involved. Moreover, in furtherance of its scheme, and to ensure that Spence's assets did not give rise to another competitor, FIS voted against the deal to sell Spence's assets.

155. But for FIS's repeated misrepresentations and omissions, Spence would not have engaged with FIS. Among other things, Spence would have never participated in due diligence or negotiations, worked toward building the partnership products, made substantial remediations to

the company, delivered important proprietary information to FIS, introduced FIS to key industry participants, permitted FIS to use Spence's name, accepted FIS's draconian investment terms, or forsaken all other business opportunities to Spence's detriment.

156.    Spence justifiably acted in reliance on the truth of FIS's statements and omissions of material facts.  Spence believed that FIS intended to partner—exclusively—with Spence.  In turn, Spence fully committed to the partnership, forgoing all other potential opportunities and focusing exclusively on its collaboration with FIS.  For example, Spence spent substantial resources and capital preparing for and in furtherance of what it was led to believe was a forthcoming, and later existing, partnership.  Among other things, Spence worked tirelessly to build the products and capabilities to suit the partnership, spent money and resources on onboarding new employees, developed multiple new corporate policies with an eye towards better partnership and alignment with FIS, and relayed and delivered important and proprietary information to FIS.

157.    As a result of the foregoing, Spence has suffered, and continues to suffer, substantial damages in an amount to be determined at trial.  Additionally, Spence continues to incur monetary damages in connection with enforcing its rights, including attorney's fees incurred in bringing this action.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays that this Court enter Judgment against defendants Fidelity National and Worldpay, as follows:

a) Awarding damages in an amount to be determined at trial, including but not limited to an award of compensatory and punitive damages;

b) Awarding Plaintiff the costs, fees, and expenses, including attorney's fees, incurred in connection with this action;

c) Awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated: August 23, 2023                                 Respectfully submitted,

*/s/ William D. Patterson*                              */s/ Andrew L. Schwartz*

William D. Patterson                                    Andrew L. Schwartz (*pro hac* forthcoming)
Benjamin Lothson                                        Sabrina Baig (*pro hac* forthcoming)
**SWANSON, MARTIN & BELL, LLP**          **KASOWITZ BENSON TORRES LLP**
330 N. Wabash, Suite 3300                          1633 Broadway
Chicago, Illinois 60611                                New York, New York 10019
Tel. (312) 321-8445                                   Tel. (212) 506-1700

*Local Counsel for Plaintiff*                          *Counsel for Plaintiff*

50