**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| EMERGING INDUSTRY TECHNOLOGIES, INC., | ) ) ) | |
| Plaintiff, | ) ) | Case No. 23-cv-5922 |
| v. | ) ) | Hon. Steven C. Seeger |
| FIDELITY NATIONAL INFORMATION SERVICES, INC., | ) ) ) | |
| Defendant. | ) ) | |

_____ )

## <u>MEMORANDUM OPINION AND ORDER</u>

This case is about a potential business relationship that went up in smoke and down in flames. Plaintiff Emerging Industry Technologies, Inc. – which does business as Spence Labs – developed payment methods for use in the cannabis industry. Those payment methods offered an alternative to cash payments. Cash is king in dispensaries, given the desire to keep off the grid from a regulatory perspective.

Defendant Fidelity National Information Services, Inc. ("FIS") considered acquiring Spence. However, FIS decided to invest in Spence, not buy it. FIS also planned to partner with Spence to roll out various payment methods as "partnership products."

Spence and FIS announced big plans, and the companies started laying the groundwork for their would-be partnership. Spence significantly restructured its business, and hired additional employees, to get the partnership products off the ground. The parties ironed out some details of their agreement. But they never inked a final partnership contract.

Ultimately, FIS pulled the plug on the partnership. It decided to go solo in the cannabis payment space.

But by that point, Spence had retooled its business to meet FIS's requirements. Spence began to bleed staff – and clients – because of FIS's exit. Spence couldn't survive the blow, and it lost almost all of its value.

Then, Spence sued FIS. The startup filed a five-count complaint, alleging breach of contract, fraudulent concealment, unjust enrichment, promissory estoppel, and fraudulent inducement/misrepresentation. FIS moved to dismiss.

For the following reasons, the motion to dismiss is granted in part and denied in part.

## Background

At the motion-to-dismiss stage, the Court must accept as true the complaint's well-pleaded allegations. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

### *Spence Labs*

The story begins with Christopher Rentner. He noticed that banks were processing a lot of cash for marijuana dispensaries. *See* Am. Cplt., at ¶ 30 (Dckt. No. 9). He saw a lane for a company to swoop in and develop a digital alternative. *Id.* So, in 2019, Renter founded a cannabis financial technology startup, Plaintiff Emerging Industry Technologies, Inc. (also known as Spence Labs). *Id.*

Based in Chicago, Spence has a simple mission: to provide "compliant [cash] payment alternatives to legal dispensaries and merchants through secure and transparent electronic payment platforms." *Id.* at ¶ 29.

The cannabis industry has expanded rapidly as more states legalize its use.  *Id.* at ¶ 28. But, because cannabis remains illegal at the federal level, dispensaries often deal exclusively in cash.  *Id.* at ¶ 29.  The idea is to stay off the grid, and out of trouble.

Spence sensed an opportunity to develop alternative, more efficient payment methods that comply with government regulations.  Such alternatives give consumers more ways to pay, and allow dispensaries to keep less cash on hand.

Spence started off by offering dispensaries Automatic Clearing House (ACH) contactless payment capabilities, in partnership with sponsor banks.  *Id.* at ¶ 31.  Basically, Spence served as an intermediary between two banks for electronic transfers for money.  *Id.*  Customers could prepay online or pay in person through their smartphones.  *Id.*

Along the way, Spence added other payment solutions.  *Id.* at ¶ 32.  It offered Buy Now Pay Later, an installment loan that divides payments into multiple equal segments.  *Id.*  A customer makes the first payment at checkout, and remaining payments are billed to the customer's debit cards.  *Id.*

Pay-later options have gained traction in the retail sector over the past few years, spurred by fintech companies such as Afterpay, Klarna, and Zip.  But Spence was among the first to introduce Buy Now Pay Later to the cannabis market.  *Id.* at ¶ 33.  The startup jumped through multiple regulatory hoops to execute its pay-later option in a compliant manner.  *Id.*  The regulatory scheme imposed a hurdle for others hoping to introduce similar products.  *Id.*

Spence also offered Instant Pay-with-Wallet.  *Id.* at ¶ 32.  That payment method allows customers to pay through a virtual wallet, without having a physical credit card on hand.  *Id.* Basically, the customer can add funds to the virtual wallet through a debit or credit card.  *Id.* (Coffee-addicted readers can think of the Starbucks app as an apt comparator.  *Id.*)

3

*Fidelity National Information Services*

Defendant Fidelity National Information Services, Inc. ("FIS") is a multi-billion-dollar public financial products corporation.  *Id.* at ¶ 1.

Around the same time that Rentner founded Spence, FIS acquired Worldpay for $43 billion (more on Worldpay in a second).  *Id.* at ¶ 34.  "Post-acquisition, FIS provides global e-commerce and payment technologies to financial institutions and businesses and, in recent years, has become the largest processing and payments company in the world."  *Id.*

As an FIS subsidiary, Worldpay is one of the world's largest global merchant acquirers. *Id.*  It "specializes in consumer transactions and offers technology platforms that integrate payment technologies to streamline and manage payment processing."  *Id.*

*Negotiations Between FIS & Spence*

In 2021, FIS began discussing the possibility of acquiring Spence.  *Id.* at ¶ 36.  FIS President of Impact Ventures Rob Lee had previously worked with Rentner (the founder of Spence).  *Id.*  Lee floated the possibility of FIS buying Spence for $15 million.  *Id.*  After the acquisition, FIS would build up Spence as an internal cannabis technology program.  *Id.*

FIS's interest in Spence was not isolated.  It took a broader interest in cannabis at that time.  The company posted a job listing for someone to lead its internal cannabis and CBD team. *Id.* at ¶ 37.  In the listing, FIS highlighted that cannabis and CBD represented "a new, high growth space for payments."  *Id.*

By mid-2022, FIS's discussions with Spence had shifted.  *Id.* at ¶ 38.  At that point, FIS took interest in Spence as an "arm's length operator in cannabis."  *Id.*  Lee told Rentner that FIS would invest in Spence after getting the go-ahead from FIS's business side.  *Id.*  And Lee said that FIS wanted to work with Spence on a commercial partnership after investing.  *Id.*

To that end, several senior-level FIS employees contacted Rentner for more information about Spence. *Id.* at ¶ 39. After multiple conversations, they developed a roadmap for how FIS, Spence, and FIS's sponsor banks could handle cannabis transactions in a compliant manner. *Id.* FIS President Stephanie Ferris and Worldpay President Jim Johnson signed off, and the parties began due diligence. *Id.* at ¶ 40.

After Ferris and Johnson gave the project the greenlight, FIS started asking Spence for documents about its business model, audits, research, and strategies. *Id.* at ¶ 41. Based on its review, FIS indicated that a relationship between Spence and FIS was "highly feasible, but first subject to legal and executive sign off." *Id.*

In July 2022, FIS sent Spence an email detailing its plan for next steps. *Id.* at ¶ 42. The email included an attachment titled "Proposed FIS/Spence Labs Investment & Partnership." *Id.* The document provided high-level terms for a partnership, including the dollar amount for FIS's initial investment in Spence. *Id.*

FIS also sent Spence a document titled "FIS & Spence Partnership Workplan Proposal." *Id.* at ¶ 43. That document explained how the "partnership" between FIS and Spence would "enable[] FIS to build market coverage through Spence which is currently operating in the market while allowing it to leverage our payments expertise, global brand and distribution scale." *Id.* In addition, the document outlined the "FIS-Spence Partnership – Governance Structure," which included details about who would sit on certain committees. *Id.*

Executives from FIS gave the company's commercial and investment teams approval to plow ahead with Spence. *Id.* at ¶ 44. Eric Queathem, Worldpay's global head of strategy and emerging business, told Spence that "we aren't thinking about this as an investment from our venture fund (i.e., the process is different)." *Id.*

FIS and Spence engaged in due diligence and negotiations over the next few weeks, including discussions about Spence's integration partnership, prospective customers, compliance providers, and legal team. *Id.* at ¶ 45. FIS continued to seek additional documents from Spence. *Id.* In turn, Spence uploaded more than 50 categories of documents to a data room. *Id.*

FIS's outside counsel, Venable LLP, conducted a thorough review of Spence during the due diligence process. *Id.* at ¶ 46. After months of interviews and document reviews, Venable told FIS that it saw "no issues with investing in or partnering with Spence." *Id.* at ¶¶ 46–47. Queathem told Rentner that FIS's president and general counsel had signed off on the partnership. *Id.* at ¶ 47.

***The Partnership Agreement***

With executive approval in place, FIS volunteered to draft and circulate a document outlining the agreed terms of the business relationship between Spence and FIS. *Id.* at ¶ 48. Spence refers to that document as the "Partnership Agreement." *Id.*

One of the issues is whether the Partnership Agreement was a binding contract, or was simply a draft that the parties never finalized. For now, to make things easy, the Court will refer to it as the partnership agreement, instead of the "draft" partnership agreement. (Stay tuned.)

The partnership agreement stated that Spence would "serve as FIS' exclusive preferred provider for Worldpay globally on cannabis deals." *Id.* at ¶ 50. In addition, it contained terms about the products that the partnership would offer, how revenue would be allocated, where the partnership would operate, and how long the agreement would last. *Id.*

Under the agreement, Spence and FIS would "both deliver services 'at cost'" and would "split economies" on products like Buy Now Pay Later and Instant Pay-with-Wallet. *Id.* at ¶ 51. The agreement detailed the "cost basis and revenue share calculation." *Id.*

Additionally, the partnership agreement provided that Spence would be "FIS' preferred global provider w/ right of first option to go after any client globally." *Id.* at ¶ 52. FIS would serve as the "exclusive payments provider of Spence, given a right of first refusal on delivering the services of any Spence payment needs." *Id.* Also, Spence would constitute "FIS' exclusive preferred provider for Worldpay globally on cannabis deals." *Id.*

The partnership would last "5 years with a 2 year rolling extension." *Id.* at ¶ 53. On termination of the contract, FIS would "be paid in full for rev-share associated with all revenue rights obtained during the contracted term . . . for all referred merchants." *Id.* The agreement included a subsection titled "Referral business/program" that explained how referral fees would be paid. *Id.*

FIS and Spence "stated that, as a formality, they would move those terms into another document that FIS would also put together." *Id.* at ¶ 54. However, "both parties agreed and understood that there was a Partnership Agreement and the partnership could move forward." *Id.*

Based on the partnership agreement, Spence devoted "countless hours" to coding and engineering products that the partnership would offer. *Id.* at ¶ 55. Spence also hired employees as part of remediation efforts required under the investment and commercial deals. *Id.*

FIS began preparing internally for the partnership, too. *Id.* at ¶ 56. The company created a presentation called "Spence GTM strategy." *Id.* That presentation detailed the scope of the partnership. *Id.* The presentation also provided that the project would "kick off" after the world's biggest cannabis business conference, the Marijuana Business Conference (MJBizCon). *Id.*

***FIS's Investment in Spence***

The partnership agreement was simply one piece of the puzzle. Separately, FIS and Spence negotiated for FIS to invest in Spence. *Id.* at ¶ 59. That investment came with some strings attached.

For example, Spence could not conduct business with FIS's competitors unless it gave FIS more than a month of advance notice. *Id.* FIS had a first offer right on any future acquisitions of Spence. *Id.* Spence could not enter an agreement, contract, or understanding that would restrict FIS's activities – unless FIS was also party to that agreement, contract, or understanding. *Id.* And any holder of Spence stock would need to give FIS a chance to participate in the sale. *Id.*

That investment contained so many strings that, in Spence's view, no company would have agreed to it as an arm's length deal. *Id.* at ¶ 60. To make the deal enticing to Spence, FIS promised to reward Spence through a profitable partnership agreement if Spence agreed to the investment. *Id.* FIS repeatedly assured Spence that FIS would "take care" of Spence if it accepted the investment terms. *Id.*

Spence believed those promises because of the partnership agreement and other representations by FIS. *Id.* at ¶ 61. When Rentner expressed concerns over the investment terms in a meeting with Stephane Wyper, an FIS executive, Wyper assured Rentner that the benefits of the commercial partnership would make up for the restrictive terms of the investment deal. *Id.* FIS also began publicly promoting the FIS-Spence partnership. *Id.* Based on FIS's actions, Spence believes that it was foreseeable that Spence would "expend significant financial resources and manpower to satisfy the remediations required by FIS." *Id.*

8

And FIS demanded many remediations by Spence. *Id.* at ¶ 62. The investment term sheet required Spence to "make significant changes to its corporate structure, policies, procedures, and business model." *Id.* According to the complaint, FIS wouldn't require a startup to make those remediations unless it entered a commercial partnership. *Id.* at ¶ 63. That is, FIS did not require any company in which it invested to make these kinds of changes.

FIS agreed to invest up to its maximum investment threshold: $5 million (the amount later became $4.5 million after a Spence investor invoked its preemptive rights). *Id.* at ¶ 64. According to FIS, the $4.5 million investment marked the first time that it was the lead investor on a deal, rather than a follow-on investor. *Id.*

Because of FIS's promises and assurances about the commercial partnership, Spence agreed to the investment and worked to meet FIS's demands. *Id.* at ¶ 65. Specifically, Spence gave FIS certain rights and a large portion of its equity. *Id.* It also made changes to its business designed for a partnership with FIS. *Id.*

### FIS's Announcement of the Partnership with Spence

In November 2022, FIS announced its partnership with FIS at MJBizCon. *Id.* at ¶ 66. FIS billed the event as "the launch of our joint efforts with Spence." *Id.*

Before the conference, it circulated a document to FIS about messaging, titled "MJBizCon Prep & Messaging Worldpay / Spence." *Id.* at ¶ 67. The document contained a slide that stated "Worldpay and Spence are partners." *Id.* at ¶ 68.

FIS's messaging focused on the "compliant and transparent, fully integrated suite of digital payments," including Buy Now Pay Later and Instant Pay-with-Wallet. *Id.* at ¶ 70. The "FAQ" section of the document stated that Worldpay and Spence were "pleased to partner as we build a compliant payment system that supports the US cannabis industry." *Id.*

9

FIS's slides emphasized that FIS did not *own* Spence. *Id.* at ¶ 69. FIS's messaging centered around the commercial partnership – not the investment. *Id.* In fact, FIS did not want word of the investment to become public. *Id.* The company believed that its public institutional shareholders might take issue with an investment in a cannabis-focused business. *Id.*

To celebrate the announcement, FIS hosted a cocktail party with co-branded swag, such as hoodies and table toppers. *Id.* at ¶ 72. FIS and Spence agreed to share the costs of the event. *Id.* Key cannabis executives received invitations to the party. *Id.* In fact, FIS emailed about 100 leaders in the cannabis industry before MJBizCon, using Spence's contact list. *Id.* at ¶ 79. Spence also started introducing FIS executives to key industry leaders and potential partners. *Id.* at ¶ 81.

A few days after the announcement, FIS launched a dedicated partnership website. *Id.* at ¶ 74. That site, which received approval from the FIS legal team, contained language about how "Worldpay and Spence have aligned to deliver conventional payment methods to the cannabis industry." *Id.* It also emphasized that the parties had put their "combined capabilities" toward "offering a transparent, fully integrated suite of digital payments." *Id.* at ¶ 76.

In a post-launch email, FIS encouraged recipients to visit the partnership website. *Id.* at ¶ 80. FIS framed the event as "the launch of our joint efforts with Spence to deliver conventional payment methods to the cannabis industry, across North America." *Id.*

Spence posted about the website, which was hosted by FIS, on its own social media accounts. *Id.* at ¶ 82. The startup relied on FIS's partnership promo blitz to hit the ground running and deliver the partnership products as advertised. *Id.* at ¶ 83.

*The Market Response to the Announcement*

After FIS's announcement, potential customers, merchants, and partners began contacting Spence about partnering with Spence and FIS. *Id.* at ¶ 84. Major players in the cannabis space asked Spence about accessing certain payment products announced by FIS. *Id.* at ¶ 85. FIS received requests about business based on the partnership, too. *Id.*

In particular, the market took interest in the payment products touted by FIS, including Buy Now Pay Later and Instant Pay-with-Wallet. *Id.* at ¶ 86. Demand for pay-later services was growing, and the market wanted to gain access to the services offered by FIS and Spence. *Id.*

FIS advertised the partnership products, like Buy Now Pay Later, as "current" capabilities of the partnership. *Id.* at ¶ 87. That terminology was a bit imprecise. *Id.* In reality, Spence was still building out those products. *Id.* It pushed its employees to work extra hours to complete them. *Id.*

To move things along, FIS gave Spence access to its payment platform sandbox (a virtual testing platform). *Id.* at ¶ 88. Additionally, FIS provided Spence with merchant category codes used to classify the type of transactions being processed. *Id.*

*Spence's Business Remediations*

Spence made major business remediations as required by FIS through the commercial and investment deals. *Id.* at ¶ 89. In a December 2022 letter to FIS, Spence's VP of compliance detailed the remediations taken by Spence to comply with the commercial deal requirements. *Id.*

For instance, Spence retooled the language and content on its website to specify the products and services currently available or pending availability. *Id.*

11

The startup took multiple steps aimed at ensuring compliance, too. It provided express certifications of compliance with applicable state cannabis laws on its site. *Id.* It also hired a dedicated VP of compliance and contracted with an ACH manager. *Id.*

In addition, Spence developed a board governance policy specifying how its board review and approval process worked. *Id.* It also underwent a risk assessment and established an ongoing risk assessment strategy. *Id.* Plus, the startup updated its policy to provide more robust explanations on its processes for collecting information from cannabis-related business and monitoring/reporting suspicious activity. *Id.*

In total, Spence spent millions of dollars on recruiting fees, legal fees, development fees, salaries, and hardware purchases to comply with FIS's requirements. *Id.*

Spence's efforts seemed to satisfy FIS. In response to the letter from Spence's VP of compliance, Queathem (the Worldpay executive) wrote that the remediations were "amazing." *Id.* at ¶ 90.

***Trouble Behind the Scenes at FIS***

As Spence prepared for the launch of the partnership products, FIS was experiencing financial challenges on its end, behind the scenes. *Id.* at ¶ 91.

In November 2022, FIS reported that Worldpay (its Merchant Solutions segment) had suffered losses. *Id.* at ¶ 92. That news caused FIS's stock to plummet by almost 30%, erasing billions in market cap. *Id.*

FIS responded by announcing a "comprehensive assessment" of its "strategy, business, operations, and structure." *Id.* It also announced the early departure of its CEO. *Id.* Ferris (who was promoted to FIS CEO from her former role as president) announced that the company was

"taking a hard look at every aspect of our company to define areas for change and develop specific areas and improvement plans." *Id.* at ¶ 93.

FIS's assessment led to job cuts. *Id.* at ¶ 94. In February 2023, the company let over 2,500 employees go, along with thousands of contractors. *Id.*

FIS also announced plans to spin off Worldpay, recognizing a $17.6 billion write-down in the process. *Id.*

In an earnings call, Ferris explained that Worldpay "operates in a more dynamic and disruptive end market" than FIS, and that the separation would "allow Worldpay to pursue a more growth-oriented strategy." *Id.* Post spinoff, FIS could "target a strong investment grade credit rating," while Worldpay could "invest more aggressively for growth." *Id.*

In July 2023, FIS issued a press release announcing "an acceleration of its previously announced separation plan to create two highly focused global companies with greater strategic flexibility." *Id.* at ¶ 95. The release stated that FIS had sold a majority stake in Worldpay to a Chicago-based private equity firm. *Id.* FIS would retain 45% ownership in Worldpay. *Id.*

***FIS's Repudiation of the Partnership Agreement***

As Spence sees things, FIS's plan to move away from "aggressive" investments caused it to slowly march toward repudiation. *Id.* at ¶ 96.

At that point, the complaint rolls back the tape, and turns back the clock to the last few months of 2022. So, the Court will pick up with the story by turning to the backstory.

In November 2022, three months before FIS announced the spinoff of Worldpay, FIS sent Spence a draft agreement titled "Spence Referral Agreement." *Id.* at ¶ 97. That document detailed a structure in which the parties would send potential customers to each other, in

exchange for a fee. *Id.* Referrals were an ancillary part of the partnership agreement that the parties had discussed previously. *Id.*

Apparently, Spence was waiting on a document that reflected the main aspects of the partnership agreement. *Id.* at ¶ 98. After weeks of waiting, Spence sent FIS its own draft in January 2023. *Id.*

In response, FIS suggested that Spence and FIS should work only under a "referral" framework, rather than operating under the full partnership agreement. *Id.* at ¶ 99. Spence wanted the whole shebang, so it refused. *Id.*

FIS responded by stating that it didn't need Spence. *Id.* FIS suggested that it could work with customers directly – and cut out Spence entirely – if it wanted to do so. *Id.*

Spence tried to follow up with FIS, but it kept getting ignored. *Id.* at ¶ 100. Then, FIS gave Spence access to its virtual testing platform. *Id.* Because that access would be unnecessary under a referral arrangement, Spence assumed that the partnership agreement was back on track. *Id.* Plus, FIS emailed Spence about strategy planning for the partnership. *Id.* FIS indicated that the "current focus" of the arrangement would be "to utilize Worldpay to process consumer payments over to Spence." *Id.*

Still, Spence expressed its concerns about FIS's recent conduct. *Id.* at ¶ 101. But FIS executive Elaine Duff assured Spence that no "macro issues" prevented FIS from moving forward with the partnership. *Id.*

According to Spence, that statement wasn't true. *Id.* Spence believes that FIS knowingly concealed behind-the-scenes issues, despite knowing that Spence would rely on its reassurances. *Id.*

A few days after Duff's assurance, FIS announced the Worldpay spinoff (again, in February 2023). *Id.* at ¶ 102. In response, Spence sent a series of follow-up emails to FIS. *Id.* at ¶ 103. Queathem (Worldpay's global head of strategy) tried to walk back Duff's comments. *Id.* He wrote that "we need to focus on the reality of what Spence is capable of providing today/soon" and that "we need to go back to square one." *Id.*

Queathem's comments were news to Spence. As far as Spence knew, FIS and Spence had plans to launch their partnership products by mid-2023 – *i.e.*, within a few months. *Id.* And Spence was working overtime to get those partnership products ready for showtime. *Id.*

Spence followed up with FIS repeatedly about why FIS wanted to start from "square one." *Id.* at ¶ 104. Spence founder Rentner got down to business. *Id.* He emailed FIS in late February explaining that "we need to move forward with our partnership asap and deliver on what was announced to the market. This delay cannot continue – lack of action may be very detrimental to the future of Spence, even putting the company at risk of complete failure." *Id.*

Queathem responded. *Id.* He did not deny the existence of a partnership or take issue with Rentner's insistence on plowing forward. *Id.* Instead, he scheduled a meeting. *Id.* Spence and FIS exchanged additional spotty communications over the coming days. *Id.*

Finally, FIS made clear that it was not moving forward with the partnership agreement. *Id.* at ¶ 105. In March, Worldpay executive Nicole Asling emailed Spence that FIS was only willing to agree to "potential referral terms" for non-cannabis merchants. *Id.* A partnership in the cannabis space was off the table.

Given that Spence is a cannabis-focused company, the no-cannabis requirement shut the door on any meaningful partnership. *Id.* FIS's statements also contradicted its earlier

representations, which provided that *only* marijuana-related companies fell within the scope of the partnership. *Id.*

Worldpay executive Holly Worst followed up on Asling's email. *Id.* at ¶ 106. Worst told Spence that the Buy Now Pay Later product "was declined by compliance." *Id.* She suggested that FIS and Spence could "meet monthly" to discuss "any potential referral deals from both sides as stated below in [Asling's] email." *Id.* Worst emphasized that "Cannabis is still a high priority for us. We still have dedicated team members and leadership is still on board to win in this vertical." *Id.*

Brian Fisher, Worldpay senior business development manager, piled more bad news on top of Asling's and Worst's messages. *Id.* at ¶ 107. Fisher informed Spence that "Spence's application for a merchant account with Worldpay was declined." *Id.* According to Fisher, the decision to decline the application was "handed down from our compliance, legal, and risk & controls team" and was "due to an unsupported business model that violated the current FIS cannabis policy." *Id.*

As Spence sees things, FIS decided to do exactly what Queathem had threatened – namely, proceed in the cannabis financial processing space sans Spence. *Id.* at ¶ 109. A few weeks after FIS repudiated the Spence partnership, a Worldpay employee responsible for the company's cannabis strategy, Alexandra Maxwell, appeared on a cannabis-related podcast. *Id.* at ¶ 110. Maxwell emphasized that marijuana was a major focus for Worldpay. *Id.* She also touted FIS's work with cannabis dispensaries. *Id.*

Spence believes that FIS has a pattern of promising to partner with startups, then pulling the plug. *Id.* at ¶ 111. According to the complaint, FIS "is also currently trying to walk back its

commitments and promises to another startup that reworked its business for its anticipated FIS partnership." *Id.*

***Spence's Closure***

Based on FIS's promises, Spence oriented its business around "anticipated material revenue from the partnership." *Id.* at ¶ 113. Spence had basically committed to only working with FIS. *Id.* But once Spence made the commitment, FIS reneged. *Id.*

Spence spent significant resources – and made major, business-altering decisions – in preparation for the partnership. *Id.* at ¶ 114. The repudiation spelled Spence's end. *Id.* at ¶ 115.

Spence employees began leaving in droves after learning about FIS's repudiation. *Id.* For instance, Spence's VP of compliance resigned due to the "setbacks that we've encountered with FIS." *Id.*

FIS's repudiation caused Spence's other relationships to break down, too. *Id.* at ¶ 116. For one, Spence's sponsor bank informed Spence that it would deactivate its account due to "continued uncertainty concerning the FIS/Spence partnership." *Id.* Likewise, none of the prospective business partners that Spence had introduced to FIS wanted to conduct business with Spence anymore. *Id.*

Ultimately, Spence closed shop. *Id.* at ¶ 117. The startup began winding down and terminated its employees. *Id.*

After a competitive asset bidding process, Spence secured a buyer for its assets. *Id.* at ¶ 118. That buyer, like FIS, was a payments company. *Id.*

But under the terms of the investment agreement, FIS needed to approve the asset sale. Before the shareholder vote on the asset sale, FIS gave Spence a heads-up that it did not plan to approve the sale. *Id.* FIS warned Spence that the transaction "must be approved by the holders

of at least a majority of outstanding shares of Preferred Stock of Spence, which majority must include FIS." *Id.*

But FIS offered Spence a route to approval. It informed Spence that it "would be amenable to approving the transaction" if it "receiv[ed] a general release of all claims against FIS from Spence." *Id.* Such a release would bar a lawsuit like the one at hand. *Id.*

Spence rejected that offer. *Id.* As advertised, FIS voted against the proposed sale. *Id.* Given what had transpired, the asset sale was the only way to realize any value from Spence. *Id.* at ¶ 119. But the sale would have allowed another company to pick up where Spence left off, and gain traction in the cannabis payments space. *Id.*

FIS wanted to go it alone in the marijuana payments business. *Id.* Spence theorizes that FIS blocked the sale – and sacrificed its $4.5 million investment in Spence – to maintain a larger chunk of that market. *Id.*

***This Lawsuit***

Spence responded by filing a five-count complaint against FIS.

Count I is a breach of contract/anticipatory repudiation claim. *See id.* at ¶¶ 121–27. Spence asserts that FIS breached the partnership agreement, which constituted a "valid, enforceable, and binding contract." *Id.* at ¶ 122. Count II is a fraudulent concealment claim. *Id.* at ¶¶ 128–35.

Counts III, IV, and V are pleaded in the alternative to Count I. Count III is for unjust enrichment. *Id.* at ¶¶ 136–42. Count IV is for promissory estoppel. *Id.* at ¶¶ 143–49. Count V is for fraudulent inducement/misrepresentation. *Id.* at ¶¶ 150–59.

FIS, in turn, moved to dismiss. *See* Def.'s Mtn. to Dismiss (Dckt. No. 21).

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"When ruling on a motion to dismiss, the court may consider 'documents . . . attached to the complaint, documents . . . central to the complaint and . . . referred to in it, and information that is properly subject to judicial notice.'" *Amin Ijbara Equity Corp. v. Vill. of Oak Lawn*, 860 F.3d 489, 493 n.2 (7th Cir. 2017) (quoting *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013)). "In deciding a Rule 12(b)(6) motion, the court may consider documents attached to a complaint, such as contract documents, without converting the motion into one for summary judgment." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 639–40 (7th Cir. 2015) (citing Fed. R. Civ. P. 10(c)). "When an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss." *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013).

**Analysis**

Before assessing the claims on the merits, the Court must take a detour into exhibit land. In support of its motion to dismiss, FIS filed three exhibits. *See* Dckt. Nos. 21-2–21-4. Spence took issue with introduction of the exhibits. *See* Pl.'s Resp. to Def.'s Mtn. to Dismiss, at 3 (Dckt. No. 26).

The parties devote large portions of their briefs to addressing whether the Court can consider the exhibits. So, the Court will spend some time there, too, before moving onto the viability of Spence's claims.

Spence thinks that the Court should deny the motion to dismiss because it rests on these extrinsic documents. As Spence sees it, the documents are "barely mentioned in the Complaint (if at all), incomplete (by omitting accompanying documents), and/or manipulated (via selective highlighting)." *Id.*

In response, FIS argues that "[t]he very documents Plaintiff references in its Amended Complaint prove that Plaintiff's claims fail." *See* Def.'s Reply in Support of Mtn. to Dismiss, at 2 (Dckt. No. 28). It believes that FIS's arguments about authenticity, centrality, and completeness have no merit. *Id.*

In ruling on a motion to dismiss, a court can consider not only "the complaint itself" but also "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019 (7th Cir. 2013). The Court can consider "outside exhibits that are central to the plaintiff's claim and referred to in the complaint, even if supplied by the defendants." *Andersen v. Vill. of Glenview*, 821 F. App'x 625, 627 (7th Cir. 2020).

Nonetheless, considering documents outside the complaint is not the norm: "this is a narrow exception aimed at cases interpreting, for example, a contract." *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998) (cleaned up); *see also Rao v. JPMorgan Chase Bank, N.A.*, 2022 WL 847560, at *5 (N.D. Ill. 2022) (Lee, J.).

### Exhibit 1

Exhibit 1 is a September 30, 2022 email sent by FIS's vice president of merchant strategy to Chris Rentner (Spence's founder). *See* Ex. 1 (Dckt. No. 21-2). The email has the subject line "Updated Spence Commercial Framework." *Id.* at 2 of 5. It includes an attachment titled "Commercial Terms – Spence v.3." *Id.* That attached document includes proposed terms for the FIS-Spence agreement.

Spence acknowledges that the document is "central" to its allegations. *See* Pl.'s Resp., at 5 (Dckt. No. 26). Nonetheless, Spence argues that the Court should reject the document because FIS's counsel has applied "selective yellow highlighting" to certain portions. *Id.*

FIS responded by providing the Court with an unmodified copy of the agreement. *See* Ex. 4 (Dckt. No. 28-1, at 3–7 of 34).

Spence's only argument for rejection of Exhibit 1 centered around the highlights. *Cf.* Pl.'s Resp., at 5–6 (Dckt. No. 26) (making no argument for rejection of Exhibit 1 besides the fact that the document is highlighted). FIS resolved the issue by providing a clean copy.

So, the Court will consider the highlight-free version (Exhibit 4) when ruling on the motion.

Highlight-Gate is resolved.

21

*Exhibit 2*

Exhibit 2 is a document titled "**SERIES SEED PREFERRED STOCK PURCHASE AGREEMENT**." *See* Ex. 2, at 1 (Dckt. No. 21-2) (emphasis in original). That document is the parties' investment agreement. *See* Def.'s Reply, at 3 (Dckt. No. 28).

Spence asks the Court not to consider this document because it "is missing the accompanying 'side letter' of the same date." *See* Pl.'s Resp., at 4 (Dckt. No. 26). In addition, it contends that the investment agreement is not central to its allegations because it does not claim that the investment agreement was breached. *Id.*

FIS responded by providing the Court with the "side letter." *See* Ex. 5 (Dckt. No. 28-1, at 9–16). FIS believes that the document is "central" – and thus may be considered by the Court – "due to [the complaint's] repeated reference to the document, its terms, and the investment that the document memorialized." *See* Def.'s Reply, at 3 (Dckt. No. 28).

The Court agrees with FIS. The complaint is replete with references to the investment. *See, e.g.*, Am. Cplt., at ¶¶ 6, 59–64, 66, 69, 103, 108 (Dckt. No. 9). Indeed, Spence contends that it agreed to "FIS's draconian investment terms" because of "FIS's repeated misrepresentations and omissions." *Id.* at ¶ 157.

When it comes to the complaint, the investment agreement may play second fiddle to the commercial agreement – but it's still central to the show. Therefore, the Court may properly consider the investment agreement when ruling on the motion to dismiss. *See, e.g.*, *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994) (explaining that documents "repeatedly" referred to in a complaint can be considered in ruling on a motion to dismiss without converting the motion to a motion for summary judgment); *Sherif Albert DDS, P.C. v. Cincinnati Ins. Co.*, 2023 WL 2663828, at *1 (N.D. Ill. 2023) (same).

22

The Court will consider the investment agreement. But, in the interest of completeness, the Court will also consider the "side letter."

*Exhibit 3*

Exhibit 3 is a January 5, 2023 email from Rentner to FIS. *See* Ex. 3 (Dckt. No. 21-4). The email subject line reads "Spence & FIS Commercial Agreement." *Id.* at 2 of 3. The email contained an attachment titled "Spence_FIS_preferred_global_provider_agreement.DOCX." *Id.* Exhibit 3 includes the email, but not the attachment.

In Spence's view, the Court should reject Exhibit 3 because of FIS's failure to provide the attachment. *See* Pl.'s Resp., at 3 (Dckt. No. 26). In addition, Spence contends that FIS's "only basis for attaching this incomplete document is a single paragraph among the 159-paragraph Complaint." *Id.* at 4. The paragraph in question references the attachment – *i.e.*, Spence's draft agreement – but it does not refer to the email. *See id.*; *see also* Am. Cplt., at ¶ 98 (Dckt. No. 9).

After reviewing Spence's response, FIS submitted the email attachment. *See* Ex. 4 (Dckt. No. 28-1, at 18–34 of 34). FIS admits that the cover email was not referenced in the operative complaint. *See* Def.'s Reply, at 4 (Dckt. No. 28). But the company believes that the email is nonetheless admissible as the "mechanism by which" Spence sent its draft. *Id.* Additionally, FIS contends that the email is admissible as correspondence between the parties related to the question of whether an agreement exists. *Id.*

The Court agrees with FIS. The draft agreement is central to Spence's claim – it is referenced in the complaint and bears directly on whether the parties had an agreement. *Cf. Trinity Metals, LLC v. U.S. Conveyor Techs. Mfg., Inc.*, 2023 WL 4626935, at *4 (C.D. Ill. 2023) (finding that contracts and emails could be appropriately considered when referenced in

23

complaint); *Schultz v. Epic Sys. Corp.*, 376 F. Supp. 3d 927, 930 (W.D. Wis. 2019) (considering

a cover email accompanying an arbitration agreement). Because the agreement is central, the

"related email transmission" can be considered by the Court, too. *See Lax v. Mayorkas*, 20 F.4th

1178, 1181 (7th Cir. 2021).

In sum, the Court concludes that it can review the draft agreement and the email without

converting the motion to dismiss into a motion for summary judgment.

After taking that detour, the Court can dive into the claims on the merits. The Court will

address the breach-of-contract claim (Count I), and then the fraudulent concealment claim

(Count II). Next, the Court will address promissory estoppel (Count IV) and fraudulent

inducement/misrepresentation (Count V). Finally, the Court will address unjust enrichment

(Count III).

## I.     Breach of Contract/Anticipatory Repudiation (Count I)

Count I is a claim for breach of contract/anticipatory repudiation. *See* Am. Cplt., at

¶¶ 121–27 (Dckt. No. 9). Spence alleges that FIS unilaterally and unjustifiably terminated the

partnership agreement by refusing to perform. *Id.* at ¶ 126.

Under Illinois law,[1] "[t]he elements of a breach of contract claim are: (1) the existence of

a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the

defendant; and (4) resultant injury to the plaintiff." *Kap Holdings, LLC v. Mar-Cone Appliance

Parts Co.*, 55 F.4th 517, 522 (7th Cir. 2022) (citations omitted).

---

[1] FIS argues that Illinois law governs the contract, and Spence does not dispute that Illinois law applies.
*Compare* Def.s' Mtn. to Dismiss, at 3 n.2 (Dckt. No. 21), *with* Pl.'s Resp., at 6–9 (Dckt. No. 26).
"Because this is a diversity action, the district court first ha[s] to determine which state's substantive law
[should] govern this dispute." *See Jupiter Aluminum Corp. v. Home Ins. Co.*, 225 F.3d 868, 872 (7th Cir.
2000). Illinois courts apply Illinois law "unless an actual conflict with another state's law is shown."
*Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 808 (7th Cir. 2020). The parties haven't shown a conflict here –
and in any event, they agree that Illinois law governs. So, the Court will apply Illinois law.

"The elements of an enforceable contract include offer, acceptance and consideration." *Fuqua v. SVOX AG*, 13 N.E.3d 68, 80 (Ill. App. Ct. 2014). Mutual assent is key to acceptance. "[T]here can only be a binding offer and acceptance when the parties mutually assent to definite and certain terms." *Kap Holdings*, 55 F.4th at 522.

Illinois courts take the objective approach to mutual assent. *See Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016). Under the objective theory, intent to manifest assent is judged by "outward expressions such as words and acts." *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 711 (7th Cir. 2019) (cleaned up). "Intent does not encompass one party's purely subjective understandings of which the other party is unaware." *Id.* (cleaned up).

The parties' subjective understanding about the contract can differ to some extent. "The parties do not need to share the same subjective understanding as to the terms of the contract." *Sgouros*, 817 F.3d at 1034 (cleaned up). But the parties must mutually assent to the terms of the contract. *Id.* That is, the parties must "promise performance and intentionally bind [themselves] in a legally enforceable manner." *Kap Holdings*, 55 F.4th at 525.

Even preliminary negotiations may be "enforceable if parties so intend, but that intent must be discerned from the text of the relevant instrument." *Id.* at 526; *see also Quake Const., Inc. v. Am. Airlines, Inc.*, 565 N.E.2d 990, 994 (Ill. 1990) ("[A]lthough letters of intent may be enforceable, such letters are not necessarily enforceable unless the parties intend them to be contractually binding."); *Chicago Inv. Corp. v. Dolins*, 481 N.E.2d 712, 715 (Ill. 1985) ("The fact that parties contemplate that a formal agreement will eventually be executed does not necessarily render prior agreements mere negotiations, where it is clear that the ultimate contract will be substantially based upon the same terms as the previous document.").

25

Here, Spence acknowledges that the parties intended to move the terms of the partnership agreement to another document "as a formality." *See* Am. Cplt., at ¶ 54 (Dckt. No. 9). Still, in its view, the parties had ironed out the material terms of the partnership and knew that they would work together to roll out the partnership products in spring 2023. *Id.*

FIS has a different view. It disagrees with the characterization of the document in question as a "partnership agreement." *See* Def.'s Mtn. to Dismiss, at 4 (Dckt. No. 21). The company contends that the document in question is simply a "preliminary term sheet." *Id.*

The so-called "partnership agreement" is a three-page document with the title "Commercial Terms w/ Spence." *See* Ex. 4 (Dckt. No. 28-1, at 5 of 34). The document was attached to an email from a Vice President of FIS to Spence founder Christopher Rentner dated September 20, 2022. *Id.* The subject line of the email was "Updated Spence Commercial Framework." *Id.* And the email simply said: "Chris – see attached."

The most striking thing about the so-called partnership agreement is it's hodgepodge appearance. It has a heading that reads "Commercial Terms w/ Spence." *Id.* The document is in an outline format. That is, it contains nine numbered sections, with titles such as "Spence leveraging FIS products" and "Geographies Covered." *Id.* Each section includes subparts, and sub-subparts.

By the look of things, the document is very much a work in progress. It is the contractual equivalent of a construction site on the highway, with lots of potholes, and plenty of work left to do. Portions of the documents are written in red font. *Id.* The use of intermittent red font is akin to seeing lots of bright orange cones on the side of the interstate.

The document is a step-up from scribbles on a napkin, but barely. Sometimes scribbles on a napkin can, in fact, give rise to a contract. *See Lucy v. Zehmer*, 84 S.E.2d 516 (Va. 1954). But there needs to be enough ink on the napkin.

The document does not have any of the traditional indicia of a contract between sophisticated parties. It lacks prefatory language saying, in effect, "Party A and Party B hereby agree to So and So." The document lacks language confirming the existence of a binding agreement.

The document lacks signatures, too. In fact, the document does not even include a signature block, or any other space for the parties to sign.

Even so, the lack of signatures is not dispositive. Under Illinois law, most contracts do not need to be in writing. A signature isn't a requirement for contract formation under Illinois law. *See In re Est. of Adames*, 178 N.E.3d 235, 245 (Ill. App. Ct. 2020) ("In the event that a written contract is unsigned, the parties' intent determines whether the contract is binding."); *Beard Implement Co. v. Krusa*, 567 N.E.2d 345, 349 (Ill. App. Ct. 1991) (acknowledging that acceptance can be manifested by other means than a signature).

On a related note, FIS contends that the format of the partnership agreement suggests that it wasn't meant to be binding. *See* Def.'s Mtn. to Dismiss, at 4 (Dckt. No. 21). The title of the document is simply "Commercial Terms w/ Spence." *See* Ex. 4 (Dckt. No. 28-1, at 5 of 34). Additionally, the document includes abbreviations – such as "rev" for "revenue" and "w/" for "with." *See id.*

The Court sees the point. A sophisticated business entity such as FIS typically wouldn't ascribe binding weight to such an informal document. Even so, contracts can include abbreviations. The existence of a contract does not depend on the use of formalities.

27

The problem is not the format, or the lack of magic words or legal phraseology. The informal presentation of the document isn't the problem, either. The problem is the lack of definite terms.

"A contract may be enforced even though some contract terms may be missing or left to be agreed upon, but if the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *Acad. Chicago Publishers v. Cheever*, 578 N.E.2d 981, 984 (Ill. 1991). "Indefiniteness of a material terms renders a contract unenforceable when the court cannot reasonably supply the missing term though contract[] interpretation, for example, by referencing an agreed upon formula." *Citadel Grp. Ltd. v. Washington Reg'l Med. Ctr.*, 692 F.3d 580, 590 (7th Cir. 2012).

Put differently, a "court cannot enforce a contract unless it can determine what it is." *See* 1 Corbin on Contracts § 4:1 (2024). The parties "must have expressed their intentions in a manner that is capable of being understood." *Id.* "[I]ndefiniteness . . . as to any of the essential terms of an agreement, ha[s] often been held to prevent the creation of an enforceable contract." *Id.*

At best, the document lays down the general architecture for a potential relationship. The document sketches a potential plan. The document does not pin things down, or fill in the holes.

The document contains more than a few "TBDs." In fact, the draft agreement uses the term "TBD" six times. *See* Ex. 4 (Dckt. No. 28-1, at 5 of 34) ("FIS will split economics on the following products at a TBD rev share agreement"); *id.* ("All other products/solutions to be explored on a TBD basis, w/ economics to be negotiated at a later date (i.e. NYCE debit processing)."); *id.* ("FIS will receive a 50/50 revenue share split (split TBD) on any Spence revenue tied to a business or BD opportunity that is generated by Worldpay teams and

28

introduced to Spence globally, with the exception of Canada."); *id.* ("Given Worldpay's positioning in the Canadian market, Worldpay will receive a 70/30 revenue share/split (split TBD) on any revenue generated from referral activities in the Canadian market."); *id.* ("The rate TBD and subject to negotiation, but will be in line w/ similar referral partnership rev share agreements."); *id.* ("GTM Strategy – largely TBD at a later date").

That's a lot of TBDs.

Consider the first TBD in that list. The partnership agreement states: "FIS will split economics on the following products at a TBD rev share agreement (Spence to propose rev shares after cost is taken out)." *Id.*

When it comes to important terms, "economics" is about as important as it gets. And here, the document says that the parties would "split economics" on a "TBD rev share agreement." *Id.* And Spence would "propose rev shares." *Id.*

That's not a definite term. That's a hole – and a big hole, at that. *See Kap Holdings*, 55 F.4th at 527 (explaining that a contract is not fatally indefinite when there are "just a few *immaterial* terms undecided") (emphasis added).

Spence claims that the parties had agreed for each side to deliver "their services at cost," with a "50/50 revenue share on all net revenue generated." *See* Am. Cplt., at ¶ 42 (Dckt. No. 9). That position is not consistent with the document itself. The agreement only mentions a 50/50 revenue share for "FIS referred business to Spence." *See* Ex. 4 (Dckt. No. 28-1, at 5 of 34).

The agreement leaves open the question of how the parties would split economies for the partnership products, including Buy Now Pay Later. *See id.* The terms aren't defined. They're up in the air.

Calling the document a partnership agreement might not be the right terminology, either. It does not purport to create a partnership in a legal sense, such as a limited liability partnership under Delaware law. It does not designate a general partner or a limited partner, or contain any other indicia of a legal partnership.

The structure of the relationship has . . . no structure. "Though the parties generally agreed to form a partnership or joint venture, '[t]he exact legal structure' was yet to be determined. Even if a partnership and a joint venture share common legal characteristics, the legal form of the contemplated business is an important outstanding term." *Kap Holdings*, 55 F.4th at 524.

The document reads like a rough sketch of a planned business relationship between the two companies. But it does not read like a partnership agreement. One provision does say that "[o]ur *partner contract will include* a right to review and option to negotiate commercials upon the legalization of cannabis sales within a specific geography." *See* Ex. 4 (Dckt. No. 28-1, at 5 of 34) (emphasis added).

If anything, that language suggests that the parties had not yet entered into a partnership agreement. *See Kap Holdings*, 55 F.4th at 525. Saying what the partnership contract "will" do is a backhanded way of acknowledging that the document itself isn't a partnership agreement. *Cf.* 1 Williston on Contracts § 4:37 (4th ed. 2024) ("The absence of undisputedly material terms coupled with the express conditioning of some obligations on the execution of a future agreement are hallmarks of a document that is preliminary and nonbinding.").

And more generally, the document repeatedly uses the word "will" to describe future dealings, which suggests that the parties had not yet pinned things down. "Many sections use aspirational words that neither resemble contract language nor identify clear, binding obligations.

30

Several sentences begin with what the hypothetical partnership 'would' or 'will' do in the future." *See Kap Holdings*, 55 F.4th at 524.

The Seventh Circuit addressed a similar situation in *Kap Holdings*. There, the Seventh Circuit addressed whether a term sheet satisfied the requirements for a contract under Illinois law. That term sheet began with a declaration that "PartScription and Marcone (PSM) have agreed to form a partnership/joint venture to serve the independent hardware industry." *Id.*

Even so, the Seventh Circuit held that the term sheet did not qualify as a contract. The term sheet merely outlined plans for a future business relationship. "A party can agree to a plan. But it is something else for a party to promise performance and intentionally bind itself in a legally enforceable manner. The plain language of the term sheet shows no intent to do the latter. Without identifying definite and certain terms, PartScription cannot plausibly allege the existence of a legally binding contract." *Id.*

So too here. The so-called partnership agreement created an outline for a potential business deal. But that's about it.

The document did not nail down definite terms. It's more like a vague plan to get lunch with a friend someday. That is, the so-called partnership agreement contemplates a future partnership. And it suggests possible terms. But it doesn't pin down precise terms. There is no way to gauge performance, and no standard to determine if there is a breach.

The complaint does not fill in the gaps by pointing to an oral agreement either. That is, the complaint does not allege that the parties reached an agreement by orally coming to terms to supplement the would-be partnership agreement. *Id.* at 525 ("Looking beyond the term sheet to the rest of PartScription's complaint, we similarly hold that no other allegations provide the

missing definite and certain terms. PartScription does not claim that the parties orally agreed to more detailed terms at the November 1 meeting than are identified in the term sheet.").

Spence points to other allegations suggesting that the parties mutually assented to a partnership. *See* Pl.'s Resp., at 9 (Dckt. No. 26).

For example, Spence points out that FIS publicly announced the partnership at MJBizCon. *See* Am. Cplt., at ¶ 66 (Dckt. No. 9). Spence and FIS hosted a co-branded cocktail party celebrating their collaboration, too. *Id.* at ¶ 72. Also, FIS launched a webpage that went into specifics about the partnership, including the partnership products. *Id.* at ¶¶ 74–75.

To be sure, FIS's public pronouncements about the partnership could support an inference that FIS intended to create a business relationship with Spence. *See Gupta*, 934 F.3d at 711 (explaining that the parties' objective conduct – *i.e.*, their "outward expressions such as words and acts" – is what matters when assessing intent under Illinois law).

Even so, an announcement of a relationship isn't enough. Announcing a partnership is one thing. Entering into a binding contract is another.

Overall, the Court concludes that terms are too indefinite to create a binding contract under Illinois law. *See Cheever*, 578 N.E.2d at 984. For that reason, the Court grants FIS's motion to dismiss Count I.

## II.     Fraudulent Concealment (Count II)

Count II is a fraudulent concealment claim. *See* Am. Cplt., at ¶¶ 128–35 (Dckt. No. 9).

"Fraudulent concealment occurs when a defendant intentionally induces a false belief through the concealment of a material fact while under a duty to speak." *Nartey v. Franciscan Health Hosp.*, 2 F.4th 1020, 1026 (7th Cir. 2021) (citing *Abazari v. Rosalind Franklin Univ. of Med. & Sci.*, 40 N.E.3d 264, 274 (Ill. App. Ct. 2015)).

32

The duty to disclose isn't automatic. It "arises only in certain situations." *Squires-Cannon v. Forest Pres. Dist. of Cook Cnty.*, 897 F.3d 797, 805 (7th Cir. 2018). "A duty to disclose may be based on a fiduciary relationship or a relationship of trust and confidence where defendant is in a position of influence and superiority over plaintiff. Or it may arise when a defendant tells a half-truth and then becomes obligated to tell the full truth." *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 737 (7th Cir. 2017) (cleaned up).

A duty to disclose comes up in two situations: based on a special relationship or because of a failure to correct a misleading half-truth. In Spence's view, FIS had a duty to disclose for both reasons. *See* Pl.'s Resp., at 10–11 (Dckt. No. 26). First, the Court will consider whether a special relationship existed between the parties. Then, the Court will turn to Spence's arguments about whether FIS made a misleading half-truth.[2]

## A.  Special Relationship

A duty to disclose arises when parties are in a "confidential or fiduciary relationship" or in a "situation where plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff." *Lacy v. Vill. of Maywood*, 2022 WL 4048538, at *4 (N.D. Ill. 2022) (quoting *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593

---

[2] FIS argues that the Court should dismiss Count II if it dismisses Count I, because the fraudulent concealment claim "is factually premised on the existence of the alleged Partnership Agreement." *See* Def.'s Mtn., at 8 n.4 (Dckt. No. 21). It makes this argument in a three-sentence footnote devoid of any case law. *Id.* The argument is underdeveloped and conclusory. The Court won't build FIS's argument for it. Instead, the Court concludes that the argument is waived. *See Massuda v. Panda Exp., Inc.*, 759 F.3d 779, 783 (7th Cir. 2014) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (quoting *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991)); *Hernandez v. Cook Cnty. Sheriff's Off.*, 634 F.3d 906, 913 (7th Cir. 2011) ("It is well established in our precedents that 'skeletal' arguments may be properly treated as waived . . . .").

(1996)).  A "position of superiority may arise by reason of friendship, agency, or experience."
*Connick*, 675 N.E.2d at 593.

In Illinois, "[t]he special relationship threshold is a high one."  *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 572 (7th Cir. 2012).  "[T]he defendant must be clearly dominant, either because of superior knowledge of the matter derived from . . . overmastering influence on the one side, or from weakness, dependence, or trust justifiably reposed on the other side."  *Id.*; *see also In re Boeing 737 MAX Pilots Litig.*, 638 F. Supp. 3d 838, 863 (N.D. Ill. 2022).  Given the high bar, Illinois courts have "rarely found a special trust relationship in the absence of a more formal fiduciary one."  *Wigod*, 673 F.3d at 572.

In FIS's view, the complaint shows that the parties merely had an arms-length commercial relationship.  *See* Def.'s Mtn. to Dismiss, at 10 (Dckt. No. 21).  According to FIS, Spence was a sophisticated party because it had developed a proprietary payment technology before negotiating with FIS.  *Id.*  FIS also points out that Spence had contracted with other parties before it began dealing with FIS.  *Id.*

For its part, Spence argues that FIS "repeatedly flaunted its power" throughout the due diligence and negotiation process.  *See* Pl.'s Resp., at 11 (Dckt. No. 26).  Spence points out that FIS threatened to work directly with customers.  *See* Am. Cplt., at ¶ 99 (Dckt. No. 9).  Spence asserts that FIS made good on its threat – and cut Spence out of the picture.  *Id.* at ¶ 110.

The Court agrees that FIS seemed to have the upper hand in the relationship.  FIS was a publicly traded company with billions of dollars in market cap, whereas Spence was a startup. *Id.* at ¶ 1.  One can reasonably infer that FIS, as the bigger company, had more leverage.

34

Even so, a special relationship doesn't arise simply because one party has more power. A mismatch in bargaining position, resources, and level of sophistication (without more) is not enough to give rise to a special relationship.

Unequal bargaining power is not uncommon when it comes to contracts. It is not unusual for one party to a contract to have the upper hand. But in Illinois, a special relationship isn't the norm. *See, e.g.*, *Wigod*, 673 F.3d at 572. A special relationship does not exist merely because Joe Schmo enters into an agreement with Big Company. *See Boeing 737 MAX Pilots Litig.*, 638 F. Supp. 3d at 864 ("Lots of companies have a position of 'influence or superiority,' in one way or another. Think about any run-of-the-mill relationship between a manufacturer and a consumer: car companies, pharmaceutical companies, and so on. In some sense, they have influence and superiority, but not in the sense that could give rise to a special relationship. Otherwise, special relationships would appear all over the place – the relationships would be so prevalent that they would cease to be special.").

Besides, Spence was small, but it wasn't unsophisticated. According to the complaint, Spence had "developed revolutionary and state-of-the-art payment processing technology." *See* Am. Cplt., at ¶ 1 (Dckt. No. 9). Spence founder Christopher Rentner was an experienced businessman, too – he had worked with Burling Bank on digital strategy. *Id.* at ¶ 30. Indeed, Rentner had previously worked with Rob Lee, president of impact ventures at FIS. *Id.* at ¶ 36.

To be sure, Spence was tiny compared to FIS. But a disparity in size, standing alone, is not enough to give rise to a special relationship. Otherwise, any startup could claim a special relationship in negotiations with a larger company. Spence wasn't big, but it wasn't a weakling susceptible to "overmastering influence." *See Wigod*, 673 F.3d at 572. No special relationship existed between the parties.

35

Therefore, the Court dismisses Count II to the extent that Spence attempts to base its fraudulent concealment claim on a special relationship.

## B.      Failure to Correct a Half-Truth

Shifting gears, Spence asserts that a duty to disclose existed based on FIS's failure to correct a misleading half-truth.[3]

Even without a fiduciary or other special relationship, a duty to disclose "may arise when a defendant makes a statement that it passes off as the whole truth while omitting material facts that render the statement a misleading half-truth." *Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 1004 (7th Cir. 2018) (cleaned up); *see also Heider v. Leewards Creative Crafts, Inc.*, 613 N.E.2d 805, 811 (Ill. App. Ct. 1993).[4]

Silence without a duty to disclose typically doesn't constitute fraud. If there is no duty to speak up, then there is no liability for failing to do so. But telling a half-truth isn't the same thing as staying silent.

Falsity is baked into a half-truth – that's why it is called a half-truth, not a whole-truth. The other half of a half-truth is a half-*un*truth. Another name for a half-untruth is a false statement. And a false statement can give rise to liability. "Silence accompanied by deceptive conduct or suppression of material facts results in active concealment and amounts to fraud." *Settlement Funding, LLC v. Brenston*, 998 N.E.2d 111, 122 (Ill. App. Ct. 2013); *see also Greene v. Mizuho Bank, Ltd.*, 206 F. Supp. 3d 1362, 1374 (N.D. Ill. 2016) (collecting cases); *Mullen v. GLV, Inc.*, 488 F. Supp. 3d 695, 709 (N.D. Ill. 2020), *aff'd*, 37 F.4th 1326 (7th Cir. 2022).

---

[3]  As FIS reads Illinois case law, silence and deceptive conduct, in combination, aren't enough to constitute fraudulent concealment. *See* Def.'s Reply, at 8 (Dckt. No. 28). Instead, FIS thinks that a special relationship is always required. *Id.* But FIS does not point to Illinois case law to support that proposition. *Cf. id.* at 8–9 (not citing any Illinois case law stating that a special relationship is required).

[4]  A good example of a half-truth might be the classic "Does Your Dog Bite?" scene from *Pink Panther Strikes Again*.

So, when a party to a business transaction engages in "deceptive, *affirmative* conduct . . . it becomes the duty of the party which has concealed information to speak." *See Linkepic Inc. v. Vyasil, LLC*, 370 F. Supp. 3d 906, 917 (N.D. Ill. 2019) (citations omitted); *see also Onvi, Inc. v. Radius Project Dev., Inc.*, 2022 WL 540796, at *6 (N.D. Ill. 2022) (stating that a duty to disclose arises "where silence combined with deceptive conduct results in active concealment of a material fact") (cleaned up).

"A statement which is technically true may nevertheless be fraudulent where it omits qualifying material since a 'half-truth' is sometimes more misleading than an outright lie." *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 969 (Ill. App. Ct. 2004); *see also Fleury v. Gen. Motors LLC*, 2023 WL 3792411, at *8 (N.D. Ill. 2023) ("A half-truth is a disclosure that is misleading because it omits important information.") (quoting *BCBSM, Inc. v. Walgreen Co.*, 512 F. Supp. 3d 837, 855 (N.D. Ill. 2021)).

The omission of information isn't always akin to a lie. But it can be.

Spence offers a few reasons why FIS's "silence and misconduct" created a duty to disclose. *See* Pl.'s Resp., at 11–12 (Dckt. No. 26).

For starters, it alleges that FIS "actively concealed . . . ongoing turmoil at FIS." *Id.* at 11. Specifically, FIS knew about its shift away from "aggressive" investments, but it represented to Spence that no "macro issues" would prevent the partnership from moving forward. *See* Am. Cplt., at ¶ 101 (Dckt. No. 9).

That allegation is on the thin end of the notice pleading spectrum. The allegation about no "macro issues" is not a particularly sturdy hook to hang your hat on. It feels just an inch

away from imposing a duty to disclose internal information that was inconsistent with an aspiration to do a deal. And again, Illinois law does not impose a freewheeling duty to disclose.[5]

That said, at this early stage, a plaintiff does not have to trot out its evidence, or prove its claim. The question is simply whether the complaint contains enough factual content to give rise to a plausible inference of a claim. And here, the complaint slumps over that bar.

Spence also points to another statement. FIS allegedly represented that it had declined Spence's application for a Worldpay account "due to an unsupported business model that violated the current FIS cannabis policy." *Id.* at ¶ 107. The complaint alleges that FIS hadn't said anything about a policy violation during the negotiations. *Id.* at ¶¶ 17, 46–47.

That allegation seems like a weak foundation for a fraudulent concealment claim. By the sound of things, Spence is alleging that FIS didn't mention that an internal policy would stand in the way of a deal. That allegation feels like an allegation about a freewheeling duty to disclose, instead of a half-truth. Even so, given the permissive approach to complaints, this Court will let the claim go forward.

Down the road, the fraudulent concealment claim may not survive. Spence would need to come forward with evidence of a statement, and the statement must be sufficiently definite and concrete to support a claim. Discovery will shed some light. Time will tell. In the meantime, the fraudulent concealment claim can go forward.

Therefore, the Court declines to dismiss Count II to the extent that Spence alleges fraudulent concealment based on FIS's failure to correct a half-truth.

---

[5] One wonders if a generic, high-level statement is concrete enough to give rise to a claim for fraudulent concealment.

### III.     Promissory Estoppel (Count IV)

Count IV is a claim for promissory estoppel.  *See* Am. Cplt., at ¶¶ 143–49 (Dckt. No. 9).

In Illinois, promissory estoppel serves as an alternative basis for contractual relief.  *See Wigod*, 673 F.3d at 566.  Basically, a claim for promissory estoppel can prevail "where all the other elements of a contract exist, but consideration is lacking."  *Dumas v. Infinity Broad. Corp.*, 416 F.3d 671, 677 (7th Cir. 2005).  Promissory estoppel is "an equitable device invoked to prevent a person from being injured by a change in position made in reasonable reliance on another's conduct."  *Ross v. May Co.*, 880 N.E.2d 210, 217 (Ill. App. Ct. 2007).

The elements of promissory estoppel are that "(1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendant, and (4) plaintiff relied on the promise to its detriment."  *Matthews v. Chicago Transit Auth.*, 51 N.E.3d 753, 780 (Ill. 2016) (citations omitted).  "A plaintiff's reliance must be reasonable and justifiable."  *Ross*, 880 N.E.2d at 217.

In FIS's view, Spence has failed to plausibly plead that it "reasonably relied on any unambiguous promises of Defendant regarding a partnership."  *See* Def.'s Mtn. to Dismiss, at 11 (Dckt. No. 21).  FIS points to the documents referenced in the operative complaint.  *Id.*  It argues that those documents show, as a matter of law, that Spence didn't believe that a binding partnership existed.  *Id.*  According to FIS, Spence could not have reasonably relied on promises by FIS because Spence knew that the parties hadn't finalized a deal.  *Id.* at 13.

In particular, FIS focuses on Exhibit 2, the stock agreement.  *See* Ex. 2 (Dckt. No. 21-3). That agreement, dated December 16, 2022, contains a paragraph stating that Spence "is not a participant in any joint venture, partnership or similar arrangement."  *Id.* at ¶ 2.3.  The agreement also represented that Spence was not a party to any "agreements, understandings, instruments,

contracts or proposed transactions," other than those listed on a disclosure schedule (which did not include the partnership agreement). *Id.* at ¶ 2.10. As FIS sees things, the statements show that Spence did not rely on "any FIS statements to conclude that there had been a legally binding promise to Spence, or that there was a partnership between the parties." *See* Def.'s Mtn. to Dismiss, at 12 (Dckt. No. 21).

FIS also focuses on a statement made by Spence founder Rentner in a January 5, 2023 email to FIS. *Id.* at 13 (citing Ex. 3 (Dckt. No. 21-4)). In that email, Rentner referred to a "previously dismissed informal 'term sheet.'" *See* Ex. 3, at 2 of 3.

Rentner used some language that seemed to relate to getting a deal done in the future, too. For instance, he wrote that "my assessment after being in this industry for the last 3 years would indicate that when we can get the deal done, it should largely mimic these concepts . . . ." *Id.* at 3. Rentner also wrote: "My only other ask is that we get this done soon. If that means we all need to get into a room to *hash out a deal* with legal teams and decision makers, present, lets do that." *Id.* (emphasis added).

As FIS sees things, Rentner's statement about needing to "hash out a deal" definitively shows that Spence "cannot reasonably claim to have relied on any purported promises by FIS." *See* Def.'s Mtn. to Dismiss, at 13 (Dckt. No. 21).

The Court agrees with FIS that Rentner's email cuts against an inference of reasonable reliance. So does the stock agreement.

But, at the motion-to-dismiss stage, the relevant question is not whether the email and stock agreement support an inference of reliance. *Cf. Kondaur Cap. Corp. v. Stewart Title Co.*, 2012 WL 367054, at *6 (N.D. Ill. 2012) (St. Eve, J.) (declining to determine, at the motion-to-dismiss stage, that plaintiff acted unreasonably in relying on the defendant's promises); *Chatham*

*Surgicore, Ltd. v. Health Care Serv. Corp.*, 826 N.E.2d 970, 977 (Ill. App. Ct. 2005) (explaining that, to survive a motion to dismiss, "all that [a plaintiff] ha[s] to do" is "clearly allege[]" facts suggesting that it reasonably relied on the defendant's statements). Instead, what matters is whether the email and stock agreement *conclusively* prove a lack of reliance. They do not.

Spence pleaded facts that could support an inference of reliance. For instance, when the parties came to terms on the investment agreement, FIS assured Spence that profits from the commercial partnership would make up for any restrictions or remediations required under the investment deal. *See* Am. Cplt., at ¶ 61 (Dckt. No. 9).

In addition, FIS publicly announced the partnership. *See, e.g.*, *id.* at ¶¶ 71–76. On its website, FIS publicized the partnership products, a "transparent, fully integrated suite of digital payments" that included Buy Now Pay Later and Instant Pay-with-Wallet. *Id.* at ¶ 76. Those payment options constituted part of the partnership agreement, but they were not part of the investment agreement. One could infer that Spence reasonably relied on the public pronouncements about the partnership agreement.

Again, at the motion-to-dismiss stage, the Court isn't determining which party has the stronger argument. The Court is simply determining whether Spence's factual allegations could support a finding of reasonable reliance. They could.

Based on the exhibits and the complaint, the Court cannot conclude, as a matter of law, that Spence could not have reasonably relied on FIS's promises about the partnership. Therefore, the Court declines to dismiss Count IV.

IV.     **Fraudulent Inducement/Misrepresentation (Count V)**

Count V is a claim for fraudulent inducement/misrepresentation.  *See* Am. Cplt., at

¶¶ 150–59 (Dckt. No. 9).

"Fraudulent inducement is a form of common-law fraud."  *Avon Hardware Co. v. Ace*

*Hardware Corp.*, 998 N.E.2d 1281, 1287 (Ill. App. Ct. 2013).  To state a fraudulent inducement

claim, a plaintiff must plead:  "(1) a false statement of material fact; (2) defendant's knowledge

the statement was false; (3) defendant's intent to induce the plaintiff to act, (4) plaintiff's reliance

on the truth of the statement; and (5) damages resulting from such reliance."  *Mission*

*Measurement Corp. v. Blackbaud, Inc.*, 287 F. Supp. 3d 691, 722 (N.D. Ill. 2017) (St. Eve, J.);

*see also Mitchell v. Allstate Ins. Co.*, 2021 WL 3674609, at *3 (N.D. Ill. 2021).

FIS contends that Spence's claim fails on the fourth element – reliance.  *See* Def.'s Mtn.

to Dismiss, at 13 (Dckt. No. 21).

To satisfy the reliance requirement, a "pleader must allege that his belief in the false

statement and reliance thereon was reasonable."  *Triumph Packaging Grp. v. Ward*, 877 F. Supp.

2d 629, 644 (N.D. Ill. 2012) (St. Eve, J.); *see also Phil Dressler & Assocs., Inc. v. Old Oak*

*Brook Inv. Corp.*, 548 N.E.2d 1343, 1347 (Ill. App. Ct. 1989).

FIS's arguments for dismissal of Count V largely track its arguments for dismissal of

Count IV.  *See* Def.'s Mtn. to Dismiss, at 13 n.5 (Dckt. No. 21).  Once again, FIS points to

documents cited by Spence in its complaint – namely, the stock agreement and the January 5,

2023 email from Rentner.  *Id.* at 14.  In FIS's view, such documents demonstrate that Spence

couldn't have "relied on any promise of a partnership from FIS."  *Id.*  Not so.

The Court disagrees with FIS's arguments for dismissal of Count V for the same reasons that it declines to dismiss Count IV. Again, the Court acknowledges that the documents cited by FIS support an inference that Spence did not reasonably rely on FIS's promise of a partnership.

But the question is whether the documents *conclusively* show a lack of reasonable reliance. *Cf. Triumph Packaging Grp.*, 877 F. Supp. 2d at 647 (explaining that the reasonableness of reliance can only be determined as a matter of law when "no trier of fact could find that it was reasonable to rely on the alleged statements or when only one conclusion can be drawn"); *Zeikos Inc. v. Walgreen Co.*, 2023 WL 8281523, at *7 (N.D. Ill. 2023) (collecting case). And they do not.

Spence pleaded facts that support an inference that it reasonably relied on FIS's promises about a partnership. Specifically, as explained above, Spence could have relied on FIS's public pronouncements about the partnership. Spence also could have relied on FIS's assurances that the partnership arrangement would make up for any downsides to the investment agreement.

Therefore, the Court declines to dismiss Count V.

## V.      Unjust Enrichment (Count III)

Finally, Count III is for unjust enrichment. *See* Am. Cplt., at ¶¶ 136–42 (Dckt. No. 9).

Unjust enrichment does not stand on its own two feet. It must stand on the shoulders of another claim. "[I]f an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim – and, of course, unjust enrichment will stand or fall with the related claim." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011).

Put differently, unjust enrichment is not a separate cause of action – "it's a condition brought about by fraud or other unlawful conduct." *Vanzant v. Hill's Pet Nutrition, Inc.*, 934

F.3d 730, 740 (7th Cir. 2019). If the predicate for unjust enrichment survives, the unjust enrichment claim also survives. But if a court dismisses the predicate, the unjust enrichment claim will die with it. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 447 (7th Cir. 2011); *Ass'n Benefit Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007).

In the case at hand, the parties agree that the unjust enrichment claim is tethered to the promissory estoppel and fraudulent misrepresentation claims. *See* Pl.'s Resp., at 14 (Dckt. No. 26); Def.'s Reply, at 11 (Dckt. No. 28). Spence's unjust enrichment claim sinks or floats depending on what happens with those other claims.

Here, the Court declines to dismiss the promissory estoppel and fraudulent misrepresentation claims. So, the unjust enrichment claim lives to see another day, too.

## Conclusion

For the foregoing reasons, the motion to dismiss is granted in part and denied in part.

Date: August 13, 2024          _____

                                      Steven C. Seeger
                                      United States District Judge